[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14212
_____

D.C. Docket No. 4:11-cv-00417-WS-CAS

J.R.,

                                              Plaintiff - Appellant,

versus

MICHAEL HANSEN, in his
Official Capacity as Director of the Agency
For Persons with Disabilities,

                                              Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(August 20, 2013)

Before MARTIN and FAY, Circuit Judges, and EDENFIELD,[*] District Judge.

MARTIN, Circuit Judge:

---

[*] Honorable B. Avant Edenfield, United States District Judge for the Southern District of
Georgia, sitting by designation.

J.R. is a man who was involuntarily admitted to "non-secure" residential services administered by the Florida Department of Children and Family Services in 2004. Under that same 2004 admission order, he continues to be committed in a non-secure residential facility. He filed suit against Michael Hansen, in his official capacity as the Director of the Agency for Persons with Disabilities (the successor to the Department of Children and Family Services), bringing a facial challenge to the constitutionality of Florida's statutory scheme for involuntarily admitting intellectually disabled persons to residential services, Florida Statutes § 393.11. The Agency for Persons with Disabilities (APD) is responsible for administering these residential services in Florida.[1] The District Court granted summary judgment to the APD, and it is that ruling that J.R. appeals to this Court.

J.R. says that § 393.11 violates the Due Process Clause of the 14th Amendment on its face because it creates an impermissibly high risk of wrongful deprivations of liberty. This is so, he says, because it does not provide people who have been involuntarily admitted to non-secure residential services with periodic review of their continued involuntary confinement by a decision maker who has

---

[1] After the filing of the Notice of Appeal in this case, Michael Hansen resigned and Barbara Palmer became the new Director of the Agency for Persons with Disabilities. At all times relevant to this appeal, the state statute has been defended by the APD. Therefore, for simplicity, we have referred to the Defendant-Appellee's arguments as being made by the APD, rather than by Mr. Hansen or Ms. Palmer.

2

authority to release them.[2]  Specifically, no one disputes that the circuit court that issues the initial involuntary admission order retains jurisdiction over the order of commitment, and that a person may only be released by further circuit court order. See Fla. Stat. § 393.11(11).  Neither is it disputed that the court that committed J.R. has not held a single hearing regarding his admission order since June of 2005.  It is not statutorily required to do so.  See id.

The District Court, however, employed the doctrine of constitutional avoidance to find that the statutory scheme provided constitutionally sufficient process largely on the basis of its finding that § 393.11 "places an implicit burden on APD, rather than the client, to petition the [admitting] court for release from an order of involuntary admission when the conditions for release are indicated."  The District Court certainly recognized that "section 393.11 contains no provision expressly describing APD's responsibilities should the time come when a developmentally disabled client no longer satisfies the involuntary admission requirements."  However, the court explained that the statute passed constitutional muster because it "can and should be read to imply an obligation on the part of APD to petition the circuit court to end the 'hold' on a client who is no longer deemed to be a danger to himself or others."  At oral argument before our Court, the APD repeatedly asserted that though the statute does not explicitly say so, it

_____

[2] Notably, J.R. does not argue that the initial admission process under § 393.11 is constitutionally deficient.

3

has an obligation to periodically review the propriety of continued involuntary admission and petition the court if necessary. Recognizing, as the District Court did, that the scope of the APD's obligations under the statute is critical to the constitutional inquiry, and also that this scope is a question of Florida statutory law, we conclude that in order for this court to decide this case we must certify certain questions to the Supreme Court of Florida.[3]

## I.    The Statute

Chapter 393 of the Florida Statutes provides for people with "Developmental Disabilities." See Fla. Stat. § 393.062 et seq. The legislative declaration of intent explains that the state legislature decided to privatize care for these people, prioritizing "community-based programs and services . . . in lieu of operation of programs directly by state agencies." Id. § 393.062. Florida's Medicaid Home and Community Based Services (HCBS) waivers combine state and federal funds to pay for these community-based living arrangements. A limited number of spots are available to people with disabilities, and currently there are about 20,000 voluntary applicants on the waiting list to receive HCBS Medicaid waiver services, including the services that J.R. receives.

---

[3] "When substantial doubt exists about the answer to a material state law question upon which the case turns, a federal court should certify that question to the state supreme court . . . to offer the state court the opportunity to explicate state law." Forgione v. Dennis Pirtle Agency, Inc., 93 F.3d 758, 761 (11th Cir. 1996).

4

Florida Statutes § 393.11 governs Florida's "[i]nvoluntary admission to residential services" scheme for intellectually disabled persons and explains that:

> If a person has an intellectual disability and requires involuntary admission to residential services provided by the agency, the circuit court of the county in which the person resides has jurisdiction to conduct a hearing and enter an order involuntarily admitting the person in order for the person to receive the care, treatment, habilitation, and rehabilitation that the person needs.

Fla. Stat. § 393.11(1). Upon petition or motion filed in Florida state circuit court by a petition committee, the APD, the state attorney, or counsel for the person needing services, see id. §§ 393.11(2), 916.303(2), the court appoints a committee to examine the person's intellectual abilities. Id. § 393.11(5). The circuit court then holds an adversarial hearing, where the person is entitled to representation by counsel and can examine witnesses. See id. § 393.11(6), (7).

> The circuit court may not involuntarily admit the person unless it finds that:
>
> 1. The person is intellectually disabled or autistic;
> 2. Placement in a residential setting is the least restrictive and most appropriate alternative to meet the person's needs; and
> 3. Because of the person's degree of intellectual disability or autism, the person;
>    a. Lacks sufficient capacity to give express and informed consent to a voluntary application for services pursuant to [§] 393.065 and lacks basic survival and self-care skills to such a degree that close supervision and habilitation in a residential setting is necessary and, if not provided, would result in a real and present threat of substantial harm to the person's well-being; or
>    b. Is likely to physically injure others if allowed to remain at liberty.

5

Id. § 393.11(8)(b) (emphasis added).[4]

Within 45 days of receiving the order, the APD must provide the circuit court with a copy of a "support plan" for its client, outlining a treatment plan and showing "that the person has been placed in the most appropriate, least restrictive and cost-beneficial residential setting." Id. § 393.11(8)(e).

"Support plans" are governed by section 393.0651 and apply to all APD clients in non-secure residential services without reference to voluntary or involuntary admission. See id. § 393.0651. "The ultimate goal of each [support] plan, whenever possible, shall be to enable the client to live a dignified life in the least restrictive setting, be that in the home or in the community." Id. § 393.0651.[5] Initial support plans must be developed in consultation with the client, the client's parent or guardian, or the client's appointed advocate. Id. Support plans must then be reviewed and revised annually in consultation with the same parties and based on a client's progress in achieving support plan objectives. Id. § 393.0651(7).

As we have said, the Florida circuit court that makes the first involuntary admission decision retains jurisdiction over the order and it cannot be changed

---

[4] Section 393.11 does not specify whether the residential services are "secure" or "non-secure." However, Florida Statutes § 916.303(3) allows the court to place a person in a secure facility, rather than a community placement, under a different admission standard and subject to more robust annual review. Compare Fla. Stat. § 916.303(3) with id. § 393.11. This being the case, the parties and the District Court below have all described § 393.11 as concerned with involuntary admission to non-secure residential settings, and we will do the same.

[5] A support plan may call for varying degrees of restrictive settings from a developmental disabilities center (most restrictive) to even the client's own home. See Fla. Stat. § 393.0651(5).

6

without permission from that court.  See id. § 393.11(11).  Although the Florida state circuit court must annually review a client's placement in a secure setting, Florida law does not require the court to perform an adversarial, state-initiated, periodic review of a client who has been involuntarily admitted to services in a non-secure setting.  Compare id. § 916.303(3) (review for secure settings) with id. § 393.11 (admission to residential services).  A client who disagrees with a support plan decision may challenge it in an administrative proceeding, id. § 393.0651(8), but the hearing officer can do nothing to change the original order of involuntary admission.  Rather, upon issuance of the involuntary admission order, the client is notified in writing that he or she may challenge that order by way of a habeas petition submitted to the circuit court, the only body with power to ever change the order.  Id. § 393.11(13).

## II.    J.R.

J.R. is an intellectually disabled 48 year-old man with an IQ of 56 who functions at the level of a 7 year-old.  It is not disputed that "although J.R.'s mental retardation will always exist, his potential for dangerousness . . . can change" because "J.R. can develop skills that mitigate the effect of his disability and aid him in his ability to live independently."

In 2000, J.R. was charged with sexual battery in Lee County, Florida.  In 2001, the Lee County Circuit Court found J.R. incompetent to stand trial and

involuntarily committed him to the Department of Children and Family Services (DCF), a precursor to the APD. In 2004, J.R. was involuntarily admitted to "non-secure" residential services, pursuant to § 393.11. The circuit court explained that "the purpose to be served by residential care is vocational training and social skills training." The order contains no end date.

J.R. has lived in several different group homes since the original involuntary admission order. Despite J.R.'s admission order specifying "non-secure" residential services, his movements and freedom are significantly limited. As the District Court explained, "[i]f he were to 'elope,' the police would probably be called to return him" to his group home. That being said, the scope of the limitations on J.R.'s movements has changed and will continue to change with periodic alterations to his support plan pursuant to § 393.0651. Still, as we have already observed, the circuit court has not held a hearing on J.R.'s continued involuntary admission order since 2005.

Since 2007, J.R. has been assigned a "support coordinator," Jordan Goldstein, pursuant to Fla. Stat. § 393.063(37).[6] J.R.'s most recent "support plan"

---

[6] Under the statute, a "Support coordinator" is

> a person who is designated by the agency to assist individuals and families in identifying their capacities, needs, and resources . . . and monitoring and evaluating the delivery of supports and services to determine the extent to which they meet the needs and expectations identified by the individual, family, and others who participated in the development of the support plan.

for 2012 was crafted with input from J.R.; Mr. Goldstein; Gregory Jansen, a certified behavior analyst overseeing J.R.'s case; and Katherine DeBierre, J.R.'s attorney.  As a part of this support plan, J.R. was able to move to a new residence of his choice closer to his family.  But Mr. Jansen did not recommend releasing J.R. from involuntary admission.  Neither has J.R. filed a habeas petition with the circuit court to be released from the involuntary admission order.

## III.    Standard of Review

"We review de novo the district court's ruling on the parties' cross-motions for summary judgment."  Owen v. I. C. Sys., Inc., 629 F.3d 1263, 1270 (11th Cir. 2011).

In a facial challenge, "the challenger must establish that no set of circumstances exist under which the Act would be valid."  Horton v. City of St. Augustine, Fla., 272 F.3d 1318, 1329 (11th Cir. 2001) (quotation marks omitted).

## IV.    Discussion

The Due Process Clause of the Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  "[A] § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3)

---

Fla. Stat. § 393.063(37).

9

constitutionally-inadequate process." Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003).

As the District Court explained, "[b]y its plain language, [§ 393.11] makes loss of liberty a necessary concomitant to involuntary admission to residential services." See also Addington v. Texas, 441 U.S. 418, 425, 99 S. Ct. 1804, 1809 (1979) (recognizing that "civil commitment for any purpose constitutes a significant deprivation of liberty"); Kinner v. State, 382 So. 2d 756, 760 (Fla. 2d DCA 1980) (describing § 393.11 as providing for the deprivation of liberty), rev'd on other grounds, 398 So. 2d 1360 (Fla. 1981). Thus, as the APD concedes, the first two elements of the test for a claim of the denial of due process are easily established here. The question left for us to answer is whether § 393.11 provides constitutionally adequate process.

## A. Overview

Constitutionally adequate process is a flexible concept that "cannot be divorced from the nature of the ultimate decision that is being made." Parham v. J.R., 442 U.S. 584, 608, 99 S. Ct. 2493, 2507 (1979). It is well settled that people who are lawfully involuntarily committed must be released once the grounds for the initial commitment no longer exist. See O'Connor v. Donaldson, 422 U.S. 563, 575, 95 S. Ct. 2486, 2493 (1975) (where a plaintiff challenged his continued confinement in a mental institution and the Court explained that "even if his

involuntary confinement was initially permissible, it could not constitutionally continue after that basis no longer existed"); Jackson v. Indiana, 406 U.S. 715, 738, 92 S. Ct. 1845, 1858 (1972) (where the Court held that "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed"). Thus, when someone is civilly committed, there must be some form of periodic post-commitment review. See Parham, 442 U.S. at 607, 99 S. Ct. at 2506 (holding that continuing need for commitment must be reviewed periodically).[7]

To determine what process is due, courts turn to the test from Mathews v. Eldridge, which requires the balancing of a number of considerations:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

---

[7] See also, Doe v. Austin, 848 F.2d 1386, 1396 (6th Cir. 1988) (explaining that "due process requires that some periodic review take place during" a continued involuntary commitment), cert. denied, 488 U.S. 967, 109 S. Ct. 495 (1988); Clark v. Cohen, 794 F.2d 79, 86 (3rd Cir. 1986) (explaining that a plaintiff "was entitled to periodic review of her commitment"), cert. denied, 479 U.S. 962, 107 S. Ct. 459 (1986); cf. Williams v. Wallis, 734 F.2d 1434, 1438 (11th Cir. 1984) (upholding a scheme that provided period reviews of continued commitment and remarking that "[t]he frequency of the evaluations also reduces the risk that the patient will be confined any longer than necessary"); Hickey v. Morris, 722 F.2d 543, 549 (9th Cir. 1983) (holding that a statute adequately protected a plaintiff's interest with "regular review of his continued confinement").

11

424 U.S. 319, 335, 96 S. Ct. 893, 903 (1976).  The Supreme Court in Mathews admonished courts employing this test to recognize that "procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions."  Id. at 344, 96 S. Ct. at 907.

In facial due process challenges, we have looked to the statute as written to determine whether the procedure provided comports with due process.  We have declined to simply rely on the defendant's description of how the statute operates in practice.  See Catron v. City of St. Petersburg, 658 F.3d 1260, 1269 (11th Cir. 2011) (holding a statute unconstitutional facially and as-applied because as written it failed to provide "constitutionally adequate procedural protections" despite the City's arguments about how the statute operates in practice).

## B.  Relevant Precedents

We are cognizant—and thankful—that in our task of applying the flexible balancing test of Mathews to the case at hand we do not write on a blank slate. Two cases, one from the Supreme Court and one from a panel of this Circuit, are especially instructive in helping us consider what periodic review process is due in the civil commitment context: Parham v. J.R., 442 U.S. 584, 99 S. Ct. 2493 (1979) and Williams v. Wallis, 734 F.2d 1434 (11th Cir. 1984).

### 1. Parham v. J.R.

12

In Parham, the Supreme Court examined the process due both before and after the voluntary commitment of children by their parents to state mental institutions.  442 U.S. at 587, 99 S. Ct. at 2496.  In that case, Georgia state hospital superintendents were "given the power to admit temporarily any child for 'observation and diagnosis'" and to, if "find[ing] 'evidence of mental illness' and that the child is 'suitable for treatment,'" admit the child "'for such period and under such conditions as may be authorized by law.'"  Id. at 591, 99 S. Ct. at 2498.  After that time, "the superintendent . . . [had] an affirmative duty to release any child 'who [had] recovered . . . or who [had] sufficiently improved [such] that the superintendent determines that hospitalization . . . is no longer desirable.'"  Id.

A class action suit challenged the scheme arguing that the children had a right to notice and a hearing before commitment.  Id. at 596–98, 99 S Ct. at 2501–02.  The Supreme Court ultimately disagreed.  In discussing the issue, however, the Court did

> conclude that the risk of error inherent in the parental decision to have a child institutionalized . . . is sufficiently great that some kind of inquiry should be made by a "neutral factfinder" to determine [if] the statutory requirements for admission are satisfied. . . . It is <u>necessary that the decisionmaker have the authority to refuse to admit</u> any child who does not satisfy the medical standards for admission.  Finally, <u>it is necessary that the child's continuing need for commitment be reviewed periodically by a similarly independent procedure</u>.

Id. at 606–607, 99 S. Ct. at 2506 (emphasis added) (citations omitted).

13

But, importantly, <u>Parham</u> held that that procedure did <u>not</u> have to include adversarial judicial review. The Court explained that "[o]ne factor that must be considered is the utilization of the time of . . . behavioral specialists in preparing for and participating in hearings rather than performing the task for which their special training has fitted them." <u>Id.</u> at 605–06, 99 S. Ct. at 2506. Where, "the questions are essentially medical in character," the Court rejected "the notion that the shortcomings of specialists can always be avoided by shifting the decision from a trained specialist . . . to an untrained judge or administrative hearing officer after a judicial-type hearing." <u>Id.</u> at 609, 99 S. Ct. at 2507–08. "Thus, [review by] a staff physician will suffice, so long as he or she is free to evaluate independently the child's . . . need for treatment." <u>Id.</u> at 607, 99 S. Ct. at 2507.

Though the Court focused primarily on the admission procedures, the Court did note several times that "the superintendent of each hospital is charged with an <u>affirmative statutory duty</u> to discharge any child who is no longer . . . in need of therapy." <u>Id.</u> at 615, 99 S. Ct. at 2510 (emphasis added); <u>see also</u> <u>id.</u> at 591; 99 S. Ct. at 2498. The Court explained that "[w]e have held that the periodic reviews described in the record reduce the risk of error in the initial admission and thus <u>they are necessary</u>." <u>Id.</u> at 617, 99 S. Ct. at 2511 (emphasis added). The Court remanded for determining exactly "what process is due to justify continuing a

14

voluntary commitment," but suggested the admission procedure principles should be considered.  Id. at 619, 99 S. Ct. at 2512.

## 2.  Williams v. Wallis

In Williams v. Wallis, this Court directly considered the process required in a periodic review.  Williams involved a challenge to "Alabama's procedures for the release of patients committed to the state's mental health system after being found not guilty . . . by reason of insanity."  734 F.2d at 1436.  Alabama's scheme provided for "treatment team[s]," of medical professionals who would "devise[] an individualized treatment plan" with the "goal for acquittees [to] transfer to a less restrictive environment" and eventually be released.  Id.  The team would review the acquittee every 60 to 90 days.  Id.  The Court further described how

> [t]he decision to release an acquittee is usually initiated by the treatment team. . . . After the team recommends release, an acquittee not classified as special can be released with the approval of the forensic unit director of the hospital to which he is committed.  The proposed release of special patients [who are considered dangerous to themselves and others] must be reviewed by the hospital's superintendant or his designee.  The reviewing authority may communicate the proposed release to the committing court, the district attorney, the acquittee's family, and others, or may order further treatment for, or evaluation of, the acquittee.  The hospital superintendent then makes the final decision whether to release the special patient.

Id.

The Court found that "[t]he[se] nonadversary proceedings do not create an undue risk of erroneous deprivation of liberty, and substituting an adversarial

15

element would not provide significant increased protection against such risk." Id.

at 1439. The Court explained its reasoning as follows:

> Hospitals and their medical professionals certainly have no bias against the patient or against release. Therefore, we can safely assume they are disinterested decision-makers. In fact, the mental health system's institutional goal—i.e., transfer to a less restrictive environment and eventual release—favors release. Other factors also favor release, including a perennial lack of space and financial resources, which militates against any motivation to unnecessarily prolong hospitalization, and including the medical professional's pride in his own treatment. The frequency of the evaluations also reduces the risk that the patient will be confined any longer than necessary.

Id. at 1438 (emphasis added). This Court also explained that "[t]o impose an

adversarial atmosphere upon the medical decisionmaking process would have a

natural tendency to undermine the beneficial institutional goal of finding the least

restrictive environment including eventual release." Id. at 1439 (emphasis added).

Finally, the Court also reviewed Alabama's habeas procedures and found this

"secondary or backup procedure" sufficient given that "the release decision is first

addressed in the nonadversary proceedings described above." Id. at 1440

(emphasis added).

## C.  Guiding Principles

Parham and Williams—and persuasive precedents from other circuits—yield

at least four guiding principles for our Court in analyzing Florida's involuntary

admission to residential services scheme which we consider here. First, with

respect to deprivations of liberty in the form of civil commitments, some form of

16

periodic review is required to protect against the erroneous deprivation of liberty. But adversarial review—arguably the gold standard of due process protections, see Goldberg v. Kelly, 397 U.S. 254, 266–69, 90 S. Ct. 1011, 1020–21 (1970) (requiring a hearing before ending welfare benefits)—is not necessarily required. See Parham, 442 U.S. at 607–08, 99 S. Ct. at 2506–07; Williams, 734 F.2d at 1439; see also Austin, 848 F.2d at 1396 (holding that "due process requires that some periodic review take place" but that the Sixth Circuit "cannot say that due process requires a periodic judicial review"); Hickey, 722 F.2d at 549 ("Due process does not always require an adversarial hearing.").

Second, adversarial judicial review is not necessary to protect against the erroneous deprivation of liberty where medical professionals are well positioned and mandated to consider the propriety of ongoing commitment.  In other words, where medical professionals' periodic reviews must consider release, courts are generally satisfied that the patient's liberty rights are protected.  See Parham, 442 U.S. at 615, 99 S. Ct. at 2510 (noting that the hospital superintendent "is charged with an affirmative statutory duty to discharge any child who is no longer mentally ill or in need of therapy"); Williams, 734 F.2d at 1439 (explaining that periodic reviews occur with "the beneficial institutional goal of finding the least restrictive environment including eventual release" (emphasis added)); see also Hickey, 722 F.2d at 549 (holding that adequate procedures included "regular review of [the

17

plaintiff's] <u>continued</u> confinement" (emphasis added)); <u>cf.</u> <u>Austin</u>, 848 F.2d at 1395–96 (explaining that periodic review must be of whether confinement should continue); <u>Clark</u>, 794 F.2d at 86 (describing the periodic reviews as having questioned whether the plaintiff should be afforded release).

Third, adversarial judicial review is not necessary to protect against the erroneous deprivation of liberty where medical professionals are well positioned and mandated <u>to act</u> when an ongoing commitment is no longer proper.  <u>See</u> <u>Parham</u>, 442 U.S. at 607, 99 S. Ct. at 2506 (suggesting that reviewer of "the child's continuing need for commitment" should have authority to release); <u>Williams</u>, 734 F.2d at 1436 (where the treatment team reports directly to the superintendent who has the power and duty to release).  This principle present in <u>Parham</u> and <u>Williams</u> was captured well in <u>Clark v. Cohen</u>, where a plaintiff was given periodic medical and psychological reviews that "consistently recommended that [the plaintiff] be released . . . but the reviewers lacked the authority to implement their recommendations."  794 F.2d at 86.  The Third Circuit found the scheme to violate due process because the review "required by the due process clause is not a moot court exercise.  The [reviewers] must have the authority to afford relief."  <u>Id.</u>

Fourth, the availability of adversarial judicial review in the form of habeas proceedings serves as a backup plan to protect against erroneous deprivations of liberty.  <u>See</u> <u>Williams</u>, 734 F.2d at 1440; <u>see also</u> <u>Hickey</u>, 722 F.2d at 549

18

(describing how the statute's nonadversarial review is backstopped by the "court's discretionary power" and the potential for "habeas relief").

## V.    Application

Our task is to determine whether the Florida Statute really does provide procedures that protect J.R. from the risk of erroneous deprivations.  Given the arguments made by the APD and the District Court's finding of "implicit" obligations upon the APD in this case, we believe that the answer to that question would be aided by the statutory interpretation of the Supreme Court of Florida, the ultimate arbiter of Florida law.  See Forgione 93 F.3d at 761.

### A.  Arguments

J.R. argues that § 393.11 does not pass constitutional muster because it does not entitle involuntarily admitted persons to periodic review of the propriety of continued commitment "by a decision maker that has authority to release them from commitment."  Thus, J.R. argues the involuntary admission scheme impermissibly risks an erroneous deprivation of liberty in violation of Mathews, Parham, and Williams and is unconstitutional on its face.   Based on this, J.R. says that "[h]is liberty is presently infringed pursuant to an unconstitutional statutory

19

scheme that contains no adequate procedure for the review and termination of the admission order and restoration of his liberty."[8]

The APD responds that "taken alone, this Court's ruling in Williams v. Wallis rebuts each of J.R.'s argument[s]." First, the APD argues that J.R.'s procedural due process rights are protected because § 393.0651(5) allows periodic review of support plans designed to find the "most appropriate, least restrictive, and most cost-beneficial environment for accomplishment of the objectives for

---

[8] The APD argues that "the facts of J.R.'s case undermine his challenge to section 393.11" because "[he] does not allege that it would even be appropriate to release him from his involuntary admission to services." In other words, the APD suggests that because "J.R.'s counsel has never asserted that J.R. actually should be released from his order of involuntary admission to residential services" that "J.R. alleges that he risks a violation of his constitutional rights, but fails to allege that any actual violation has occurred."

But the question of whether or not J.R. has a right to be released today does not preempt the constitutional question presented here. It is clear that a state can deprive J.R. of his liberty "with due process of law." U.S. Const. amend. XIV, § 1. "Due process of law," however, requires that some procedural protection must be given to decrease the risk that a permissible deprivation is arrived at erroneously. The question therefore is simply whether the process afforded to J.R. comports with the Constitution because it does not impermissibly risk an erroneous deprivation. See Mathews, 424 U.S. at 344, 96 S. Ct. at 907; Catron, 658 F.3d at 1269.

The APD repeatedly suggests that J.R. is, essentially, the wrong plaintiff to bring this case. In fact, J.R. is the right plaintiff, even if less than sympathetic, to challenge the facial validity of the statute because for the past nine years he has been subjected to an involuntary admission order. He has been deemed as lacking the ability to live on his own because doing so would either risk the threat of physical harm to himself or to others. See Fla. Stat. § 393.11(8)(b). If or when those conditions cease to exist, J.R. is entitled to be released from that involuntary admission order. See Jackson, 406 U.S. at 732, 92 S. Ct. at 1855. Thus, if the process provided to him under the statute is not ensuring that there is only a constitutionally acceptable risk, as defined by Mathews, that he will be kept involuntarily admitted past the time that those conditions cease to exist, then J.R. is being subjected to an ongoing Constitutional violation. See id. at 738, 92 S. Ct. at 1858; cf. Parham, 442 U.S. at 606–07, 99 S. Ct. at 2506.

client progress." See Fla. Stat. § 393.0651. The APD explains, without pointing to anything explicit in the Florida statute, that "[s]imilar to the 'treatment teams' described in Williams, the client and the client's providers may use the support plan to recommend further review of a client's order of involuntary admission" (emphasis added). Second, the APD argues that the availability of habeas corpus and the fact that upon an order of involuntary admission a person is notified in writing of the availability of habeas, see Fla. Stat. § 393.11(13), is sufficient to protect against an erroneous deprivation of liberty. We have noted with interest that the APD did not in its brief endorse any of the "implied obligations" discussed in the District Court order.

During oral argument before this Court, however, the APD insisted repeatedly that though there are no explicit procedures or requirements provided in the Florida statute for either examining the propriety of continued involuntary admission or seeking the release of a client from an improper involuntary admission order, that such considerations were "part of the analysis" involved in support plan review. The APD argued as well that the Medicaid Developmental Disabilities Waiver Services Coverage and Limitations Handbook, which was not in the record, specifies that such residential services are provided based on "medical necessity." Also newly relying on this handbook, the APD says, "the intent of waiver services as noted in our brief is to help individuals live safely in

21

the community as opposed to an institutional setting.  That is the entire point of these services."  Thus the APD argued it was clear that the statute calls for periodic review of J.R.'s continued involuntary admission to residential services.[9]

In summary, the APD argues that finding that the process laid out in § 393.11 does not provide constitutionally sufficient procedures amounts to this

---

[9] The APD also alludes to the argument that J.R. is deserving of less process than the plaintiffs in Williams or Parham—and potentially not even periodic review—because the involuntary admission to residential services is less intrusive than confinement to a mental institution.  And at oral argument, the APD closed by arguing that the involuntary admission order was more or less meaningless because there is no difference between "involuntary" and "voluntary" admission to residential services.  We reject these arguments as legally and factually incorrect, and defeated by the APD's own concessions.

First, the District Court was right to reject the APD's argument that it was of great relevance that "J.R. was not 'committed' to a state institution but was, instead, 'assigned' to community-based residential services."  As the District Court pointed out, "[b]y its plain language, the statute makes loss of liberty a necessary concomitant to involuntary admission to residential services," and Florida courts have interpreted §393.11 as doing so.  See Kinner, 382 So. 2d at 760.  In its brief, the APD conceded as much when it explained that the first element of a claim alleging the denial of procedural due process—a deprivation of a constitutionally protected liberty interest—is easily met here.

Second, pointed out by the District Court, and demonstrated by the record established below, an involuntarily committed individual cannot simply walk away from a group home and will be hauled into court should he choose to do so.  The District Court found that "J.R.'s liberty has been infringed by his involuntary assignment to a group home in a community where he does not choose to live."

Finally, Parham made clear that voluntary commitments carry less stigma than involuntary commitments.  See Parham, 442 U.S. at 600, 99 S. Ct. at 2503 (describing how the community's reaction to a child voluntarily committed "need not be equated with the community response resulting from being labeled by the state as delinquent, criminal, or mentally ill and possibly dangerous").  Thus, neither legal precedent nor the facts of his case support a finding that J.R. deserves less protection than the plaintiffs in either Parham or Williams.  Therefore, the principles espoused in those cases apply here.

Court deciding that it is "going to assume that the [APD] is not going to do what they're obligated to do."

## B.  Analysis

The problem for this Court is that it is not clear to us that the APD is "obligated to do" what the APD suggested at oral argument it is obligated to do: periodically review the involuntary admission orders of J.R. and people like him. The APD has pointed to nothing explicit in the statute indicating that an obligation exists and has offered no evidence of procedures in place to require periodic review of the involuntary commitment status of these people.

We cannot wholly disagree with J.R.'s argument that the face of the statute does not provide process that comports with the requirements of the relevant precedent.  First, the APD admits that the statute does not <u>explicitly</u> require the APD to periodically review the propriety of J.R.'s continued involuntary admission order.[10]  The statute requires only that periodic support plan reviews ask whether the client has been placed in "the most appropriate, least restrictive, and most cost-beneficial environment for accomplishment of the objectives for client progress." Fla. Stat. § 393.0651.  This contrasts with the requirements for an order involuntarily admitting a person to residential services, where a circuit court must

---

[10] Indeed, as APD puts it, citing no specific provision of the statute, "the client and the client's providers <u>may</u> use the support plan to recommend further review of a client's order of involuntary admission" (emphasis added).

find <u>both</u> (1) that "[p]lacement in a residential setting is the least restrictive and most appropriate alternative to meet the person's needs" <u>and</u> (2) that the person "lacks basic survival and self-care skills to such a degree that close supervision and habilitation in a residential setting is necessary and, if not provided, would result in a real and present threat of substantial harm to the person's well-being" or would leave the person "likely to physically injure others if allowed to remain at liberty." <u>Id.</u> § 393.11(8)(b). In other words, periodic support plan reviews consider only half of the ultimate question of whether it is necessary for someone to be involuntarily admitted to residential services.

As the APD pointed out in its brief, there are currently 20,000 people on the waiting list to <u>voluntarily</u> receive HCBS Medicaid services, including the residential services that J.R. receives. Thus the benefits provided to APD clients clearly continue beyond when one reaches the point of no longer being a danger to himself or others. As J.R.'s involuntary commitment order itself explains, in residential services he receives "vocational training and social skills training." Conceivably, J.R. could continue to make progress with respect to his vocational and social skills by remaining in some form of residential services long after he is no longer a danger to himself or others.[11] Thus the regime established in § 393.11

---

[11] Also, we do not read the statute to equate "medical necessity" with the client of APD being a danger to himself or others. It is not hard to see that HCBS Medicaid waiver services are provided out of medical necessity to individuals who are not at a great risk of harm to self or

contrasts to those in <u>Parham</u> and <u>Williams</u>, where the statutorily mandated goal of the periodic reviews was to consider release.  <u>See</u> <u>Parham</u>, 442 U.S. at 615, 99 S. Ct. at 2510 (noting "an affirmative statutory duty to discharge" when warranted); <u>Williams</u>, 734 F.2d at 1438 (describing "eventual release" as a central goal of periodic medical reviews).

Second, the statute does not provide procedures for the APD if it were to decide someone should be released from an involuntary admission order.  Nothing on the face of § 393.0651 mandates that the APD, having found a client to no longer be a danger to himself or to others, should petition the circuit court, the only body with the power to alter the order.  <u>See</u> Fla. Stat. § 393.0651; <u>id.</u> § 393.11(11).

In contrast, there are a few specific instances in which the statute does call for an involuntary admission order to non-secure residential services to be reviewed by the court.  Section 393.115, "Discharge," specifies that where a minor is involuntarily admitted to residential services, upon the client reaching the age of majority, "the [APD] shall file a petition to determine the appropriateness of continued residential placement on an involuntary basis. . . . in the court having continuing jurisdiction over the case."  <u>Id.</u> § 393.115(1)(b).  And § 393.11(9)(b)

---

others.  If every person eligible for HCBS Medicaid waiver services were at a great risk of harm to self or others, one would have to ask why the state of Florida has allowed 20,000 individuals to stay on the HCBS Medicaid waiver services waitlist.  The record contains no evidence to support a finding that any person admitted to residential services, voluntarily or involuntarily, must pose a threat to self or others.

25

explains that "[a]ny minor involuntarily admitted to residential services shall, upon reaching majority, be given a hearing to determine the continued appropriateness of his or her involuntary admission." Id. § 393.11(9)(b). That the statute provides for instances in which the APD must approach the admitting court calls into question the idea that it has an "obligation" to do so in other circumstances.

We are also aware that the Florida legislature has required periodic judicial review in other contexts. For example, the District Court recognized that an admitting court may choose to admit an intellectually disabled person into secure residential services under Fla. Stat. § 916.303(3). In that context, the secure placement is reviewed annually at a hearing. Id. § 916.303(3). Florida's mental illness statute contains similar provisions, by which people involuntarily committed to either inpatient or outpatient services receive periodic review from either the committing court or a hearing officer with the authority to afford release. See id. § 394.467(7); id. § 394.4655(7). And even people committed under Florida's Sexually Violent Predators Act receive periodic judicial review by the committing court. Id. § 394.918(1), (3). It is clear, therefore, that where the Florida legislature wishes to provide periodic review of continued commitments, it has often said so explicitly.

In contrast, in Parham, the Court emphasized the statutory mandate to afford release to a child no longer needing commitment and that the decisionmaker in

26

charge of a child's periodic review should have the authority to afford release.  See

442 U.S. at 607, 615, 99 S. Ct. at 2506, 2510.  In Williams, a procedure existed by

which a treatment team finding commitment no longer necessary was to report

their recommendation to the hospital superintendent with the power and duty to

afford release.  See 734 F.2d at 1436.

Despite the distinguishing characteristics of the statutes reviewed in Parham

and Williams, the District Court, employing the doctrine of constitutional

avoidance, did find that the statute contained plausible implied obligations.  The

District Court explained, in pertinent part:

> While section 393.11 contains no provision expressly describing APD's responsibilities should the time come when a developmentally disabled client no longer satisfies the involuntary admission requirements, the statute can and should be read to imply an obligation on the part of APD to petition the circuit court to end the "hold" on a[] client who is no longer deemed to be a danger to himself or others. The circuit court's order, after all, binds not only the client who is admitted to residential services but also the agency that is required to provide the ordered services. If APD were to determine that a client had reached the point of no longer meeting the involuntary admission requirements, the agency could not on its own authority cease to provide those services. Instead, acting in its own best interests as well as those of the individual the agency was ordered to serve, APD would have to petition the appropriate circuit court for an order releasing the agency from its responsibility to provide those services and, at the same time, releasing the client from the order of involuntary admission. If, for whatever reason, APD failed to seek a client's release from an involuntary admission no longer deemed necessary, or if the client were to disagree with an agency assessment that release would not be appropriate, then—as a safeguard—a petition for writ of habeas corpus may be filed "[a]t any time and without notice" by or on behalf of the client.

27

If the District Court is right about the APD's obligations under the statute, it may be constitutional. We still have some concerns that the statute does not, even under this formulation, require that the APD consider the propriety of the continued involuntary admission order. However, we also recognize that if the APD were held to this implied obligation, it would also, arguably, be required to periodically consider whether the "hold" should be lifted.

Although we certainly share the District Court's desire to avoid the constitutional question, we are not comfortable merely affirming its ruling based on implied obligations not explicit on the face of the statute. See Catron, 658 F.3d at 1269. Federal Courts are not the arbiters of Florida law; that responsibility rests squarely with the Supreme Court of Florida. In other words, our assertion that the statute "can and should be" read a certain way in order to provide constitutionally sufficient process does not make it such that the statute must be read that way. For that reason, we certify the following questions to the Supreme Court of Florida.

Questions Certified

1) Does "support plan" review under Fla. Stat. § 393.0651 require the Agency for Persons with Disabilities to consider the propriety of a continued involuntary admission to residential services order entered under Fla. Stat. § 393.11?

2) Is the Agency for Persons with Disabilities required, pursuant to Fla. Stat. § 393.0651 and/or Fla. Stat. § 393.11, to petition the circuit court for the release from an involuntary admission order in cases where the APD determines that the circumstances that led to the initial admission order have changed?

3) Does Fla. Stat. § 393.062 et. seq. provide a statutory mandate to meaningfully periodically review involuntary admissions to non-secure residential services consistent with the commitment schemes discussed in Parham v. J.R., 442 U.S. 584, 99 S. Ct. 2493 (1979) and Williams v. Wallis, 734 F.2d 1434 (11th Cir. 1984)?

**QUESTIONS CERTIFIED.**