Samuel DOE, by his mother and next friend, Mary DOE, Plaintiff–Appellee,

v.

Elbert AUSTIN, Secretary, Cabinet for Human Resources, Defendant–Appellant.

No. 86–6274.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 28, 1987.

Decided June 15, 1988.

Rehearing and Rehearing En Banc Denied Aug. 3, 1988.

William K. Moore (argued), Cabinet for Human Resources, Office of Gen. Counsel, Frankfort, Ky., for defendant-appellant.

Richard McHugh, Kelly Miller (argued), Legal Aid Society, Inc., Louisville, Ky., for plaintiff-appellee.

Before KEITH, MILBURN, and NORRIS, Circuit Judges.

KEITH, Circuit Judge.

Defendant Elbert Austin, Secretary, Cabinet for Human Resources for the Commonwealth of Kentucky, appeals the order of the district court granting a preliminary injunction and partial summary judgment in favor of plaintiffs, a certified class of mentally retarded persons already involuntarily committed or subject to involuntary commitment to a state-owned mental retardation residential treatment center (RTC) who had challenged the constitutionality of Kentucky's civil commitment scheme as applied to mentally retarded adults.[1] For the following reasons, we AFFIRM in part and REVERSE in part.

## I.

Prior to 1986, and at the time that this matter was initiated, Kentucky provided a comprehensive statutory scheme to govern the involuntary civil commitment of the mentally ill, Ken.Rev.Stat.Ann. Chapter 202A (Baldwin 1982), which also governed the commitment of mentally retarded persons. Ken.Rev.Stat.Ann. § 202B.050.

Ken.Rev.Stat.Ann. Chapter 202A *et seq.* provided, in relevant part:

(1) No involuntary commitment would take place unless the person to be committed (a) presented a danger or threat of danger to self or others; (b) could reasonably benefit from treatment; and (c) unless hospitalization represented the least restrictive mode of treatment, Ken.Rev.Stat.Ann. § 202A.026;

(2) Although a staff physician could order an emergency admission, that physician must certify within twenty-four hours that an involuntary admission should occur, and any such emergency admission was limited to seventy-two hours, Ken.Rev.Stat.Ann. § 202A.031;

(3) A preliminary hearing would be held in the district court within six days of the initial detention (or examination,

if no emergency admission was sought), and a final hearing would take place within twenty-one days, Ken.Rev.Stat.Ann. § 202A.071;

(4) The preliminary hearing, although not required to be formal, would provide an opportunity for the person to be committed to testify, to present witnesses, and to cross-examine witnesses who had testified against her. Ken.Rev.Stat.Ann. § 202A.076(1). The final hearing would provide the same safeguards; in addition, the rules of criminal procedure would apply, including the duty of the Commonwealth to prove beyond a reasonable doubt that confinement was warranted. Moreover, there was a right to a jury trial unless that right was waived. Ken.Rev.Stat.Ann. § 202A.076(2);

(5) The person to be committed had a right to counsel, Ken.Rev.Stat.Ann. § 202A.121, and a right to be present throughout the proceedings (unless this right was waived, or unless her conduct was unreasonably disruptive), Ken.Rev.Stat.Ann. § 202A.131;

(6) Discharge by an authorized staff physician during the prescribed period of involuntary commitment when the criteria for involuntary commitments were no longer met, Ken.Rev.Stat. Ann. § 202A.171;

(7) The opportunity for convalescent leave during the prescribed period of involuntary commitment, Ken.Rev. Stat.Ann. § 202A.181;

(8) A limitation of the prescribed period of confinement to sixty or three hundred sixty days without further judicial proceedings, Ken.Rev.Stat.Ann. § 202A.051.

Ken.Rev.Stat.Ann. § 202B.050, before 1986, provided that all rights guaranteed by Ken.Rev.Stat.Ann. Chapters 202A and

---

**1.** Amici John Larry Voyles, Danny Dyer, Brian Shehan, the Parents and Relatives of Oakwood Facility, ICF/MR, Inc. (P.R.O.O.F.) and concerned Families of Hazelwood Hospital, ICF/MR, Inc., parents and guardians of profoundly retarded individuals residing at Hazelwood Hospital, ICF/MR, filed a brief urging reversal.

210[2] would apply to mentally retarded persons. Section 202B.040 added the additional required determination to § 202A.026 that treatment that could reasonably benefit the individual be available in the hospital or mental retardation residential treatment center. Ken.Rev.Stat.Ann. § 202B.040(4). Furthermore, no mentally retarded person could be involuntarily hospitalized without the consent of the Secretary of the Cabinet for Human Resources, unless a determination of a concurrent mental illness requiring commitment was made pursuant to Chapter 202A. Ken.Rev. Stat.Ann. § 202B.030.

Despite the existence of this comprehensive statutory scheme, the Cabinet for Human Resources formed the Record Review Committee (RRC) for the purpose of controlling admissions to RTCs of mentally retarded persons. The RRC consisted of, at a minimum, a physician, a psychologist, a social worker, and a registered nurse. Procedurally, a parent or guardian was required to contact the local Comprehensive Care Center (operated by the Regional Mental Health–Mental Retardation Board), which would refer the mentally retarded person to the RRC. The written admissions policy of the Cabinet set out standards for admission:

> The suitability for admission to a mental retardation facility is determined by: a) the availability of appropriate alternative residential and training programs in the community, b) the availability of appropriate living and training space within the recommended facility, c) the severity of the applicant's handicap, and d) the status of the family's situation.

("Admissions Policies and Procedures for Mental Retardation Residential Facilities," August 21, 1981).

The RRC procedure accounted for virtually all admissions of mentally retarded persons to RTCs; indeed, during 1982, 1983, 1984 and 1985, only one mentally retarded person was admitted pursuant to the statutory procedures for involuntary commitment. However, the Cabinet's view has consistently been that admissions under the RRC procedure, initiated by the parent or guardian, are voluntary in nature. Moreover, if the committed person was able to sign the Resident's Bill of Rights form which was presented at admission, by signature or by marking an "X," her admission was considered to be voluntary.

Once a person was admitted, his or her continued commitment was ostensibly evaluated according to the Mental Retardation Facility Discharge Protocol, based on Ken. Rev.Stat.Ann. § 210.270. That section provides a mechanism for community placements once the RTC staff determines that such placement is appropriate, including provisions for challenges to reclassification.[3]

The named plaintiff, Samuel Doe, was placed in 1971, at age eighteen, in the custody of what is now the Kentucky Cabinet for Human Resources. Under the authority of the Secretary of the Cabinet, he was institutionalized in the Outwood State Hospital, Dawson Springs, Kentucky. In 1977, while still at Outwood, he was adjudicated as incompetent at the initiation of the Commonwealth. Soon thereafter, his mother was appointed as his legal guardian. Doe has received no independent review of his confinement, judicial or otherwise, throughout the seventeen years of his institutionalization.

Plaintiffs brought this action pursuant to 42 U.S.C. § 1983 challenging the failure of Kentucky to provide the safeguards required by Ken.Rev.Stat.Ann. Chapters 202A and 202B. In its first memorandum opinion, the district court found that defendants had adopted a policy of allowing parents to exert an absolute veto over the decision to release a patient to a community placement, and that such a practice was

---

**2.** Ken.Rev.Stat.Ann. Chapter 210 *et seq.* codifies the institutional structure of Kentucky's mental health care system; it is not at issue in this appeal.

**3.** Additionally, the Cabinet had adopted a policy which allowed parents an absolute veto over the decision to place their mentally ill children in community placements. This policy was held to be unconstitutional in the district court's first opinion, and is not at issue in this appeal.

contrary to the holding of the Supreme Court in *Parham v. J.R.*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979). Memorandum Opinion of March 28, 1984 (Memorandum I) at 13–17. The district court denied summary judgment in all other respects.

In its second memorandum opinion, the district court noted that because the great majority of profoundly and severely mentally retarded persons are incapable of making the decision as to whether admission into a RTC is in their best interest, all such admissions were to be considered involuntary. Memorandum Opinion of January 9, 1986 at 3, 9 (Memorandum II). It then concluded that, because Kentucky had declared that the mentally ill and the mentally retarded would be treated in the same manner, it constituted a denial of equal protection to apply the involuntary commitment statute to the mentally ill while refusing to make its provisions available to the mentally retarded. Memorandum II at 5–8.

In response to the district court's order, the Kentucky General Assembly amended Chapter 202B in an attempt to avoid the result reached by the district court. Ken. Rev.Stat.Ann. § 202B.050 was amended to read:

All rights guaranteed by K.R.S. Chapters 202A (other than those rights enumerated in K.R.S. 202A.026 and 202A.051) and K.R.S. Chapter 210 to mentally ill persons shall apply to mentally retarded persons.

Ken.Rev.Stat.Ann. § 202B.050 (Baldwin 1986). Moreover, Ken.Rev.Stat.Ann. § 202B.040, listing the requirements for admission, was amended to include a fifth subsection:

When a person who is alleged to be mentally retarded is involuntarily committed, there shall be a determination that:

(1) He is a mentally retarded person;

(2) He presents a danger or a threat of danger to self or others;

(3) The least restrictive alternative mode of treatment requires placement in a hospital or mental retardation residential treatment center;

(4) Treatment that can reasonably benefit the individual is available in the hospital or mental retardation residential treatment center; and

(5) The application by parents or guardians for placement for their retarded family member or ward in any mental retardation treatment center shall not be considered an involuntary commitment under this section, provided the retarded family member's application has been evaluated by an interdisciplinary team as defined in K.R.S. 202B.010 and the subsequent admission fully complies with the provisions of K.R.S. Chapter 202B.

Ken.Rev.Stat.Ann. § 202B.040 (1986). The effect of this amendment was to define most admissions as technically "voluntary," without reference to the actual or independent wishes of the person to be committed.

Finally, a new section, Ken.Rev.Stat. Ann. § 202B.045 (1986), codified new requirements for admission and discharge:

(1) Admission:

(a) Patients shall be admitted only upon the approval of a physician. The facility shall admit only persons who have a physical or mental condition which requires developmental nursing services and a planned program of active treatment;

(b) The interdisciplinary team shall:

1. Conduct a comprehensive evaluation of the individual, not more than three (3) months before admission, covering physical, emotional, social, and cognitive factors; and 2. Prior to admission define the need for service without regard to availability of those services. The team shall review all available and applicable programs of care, treatment, and training and record its findings;

(c) If admission is not the best plan but the individual must be admitted nevertheless, the facility shall clearly acknowledge that the admission is inappropriate and initiate plans to actively explore alternatives;

(d) Before admission, the resident and a responsible member of his family or committee shall be informed in writing of the established policies of the facility and fees, reimbursement, visitation rights during serious illness, visiting hours, type of diets offered and services offered; and

(e) The facility shall provide and maintain a system for identifying each resident's personal property and facilities for safekeeping of his declared valuables. Each resident's clothing and other property shall be reserved for his own use.

(2) Discharge planning. Prior to discharge the facility shall have a postinstitutional plan which identifies the residential setting and support services which would enable the resident to live in a less restrictive alternative to the current setting. Before a resident is released, the facility shall: (a) Offer counseling to parents or guardians who request the release of a resident concerning the advantages and disadvantages of the release; (b) Plan for release of the resident, to assure that appropriate services are available in the resident's new environment, including protective supervision and other followup services; and (c) Prepare and place in the resident's record a summary of findings, progress, and plans.

The "interdisciplinary team" was defined as:

the group of persons responsible for the diagnosis, evaluation and individualized program planning and service implementation for the resident. The team is composed of a physician, a psychologist, a registered nurse, a social worker, and other professionals, at least one (1) of whom is a qualified mental health professional, and may include the resident, the resident's family, or the guardian.

Ken.Rev.Stat.Ann. § 202B.010(1) (1986). As the district court noted, "[t]he 1986 amendments (HB 477) effectively eliminated the rights of mentally retarded persons to a judicial hearing prior to involuntary commitment." Memorandum Opinion of November 20, 1986 (Memorandum III).

Plaintiffs moved for a summary judgment declaring HB 477 unconstitutional, while defendant moved for reconsideration of the district court's opinion and partial summary judgment of January 9, 1986. On November 20, 1986, the district court (a) reconsidered its previous holding that Kentucky's commitment procedures conformed with due process, and held that due process required a judicial hearing prior to commitment; (b) found that Kentucky could not define applications by parents or guardians for placement as "voluntary," Ken.Rev.Stat.Ann. § 202B.040(5) (1986); and (c) reaffirmed that equal protection required a judicial hearing, 668 F.Supp. 597. Defendant appeals.

## II.

Involuntary civil commitment to a mental institution represents "a massive curtailment of liberty," requiring due process protection. *Vitek v. Jones,* 445 U.S. 480, 491–92, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552 (1980); *Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972). Indeed, the liberty deprivation resulting from involuntary commitment is more than a loss of mere physical freedom; the stigma which attaches upon entry to a mental health facility can have a profound impact upon individual liberty. *Addington v. Texas,* 441 U.S. 418, 425–26, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979).

The Commonwealth does not contend that it may confine persons thought to be mentally retarded without providing any degree of due process. Instead, the Commonwealth argues that: (A) the named plaintiff does not have standing to pursue the class action because his confinement is, in fact, voluntary; and (B) the due process requirement is satisfied by an administrative procedure such as the one now provided by the Commonwealth, rather than requiring a judicial officer.

## A.

As stated above, appellant's argument that Samuel Doe lacks standing to challenge the legality of his confinement

depends on the voluntariness of both his initial and continued commitment. If, as appellant contends, Doe entered the RTC voluntarily, and remains voluntarily, he would not present a controversy for adjudication.

However, we note that appellant has a view of "voluntary" behavior which is, to say the least, expansive. By legislative fiat, the Commonwealth has deemed admissions initiated by a parent or guardian to be voluntary, with no regard for the actual wishes of the committed person. Ken.Rev. Stat.Ann. § 202B.040(5) (1986). In fact, as stated by the district court:

> As noted by this Court in *Kentucky Ass'n for Retarded Citizens v. Conn.,* 510 F.Supp. 1233 (1980), *aff'd* 674 F.2d 582 (6th Cir.), *cert. denied,* 459 U.S. 1041 [103 S.Ct. 457, 74 L.Ed.2d 609] (1982), many retarded adults are placed in [RTCs] by state appointed guardians who have no family ties with the mentally retarded person, and, even in those cases where the mentally retarded person is sought to be placed in an [RTC] by a relative or person who is also his legal guardian, the label of "voluntary commitment" cannot stand up in the face of the fact that the mentally retarded person is being committed without his or her consent. *Conn., supra,* 510 F.Supp. at 1248–49.

Memorandum Opinion at 6.

We recognize that the Supreme Court has, at least implicitly, viewed the commitment of a minor to a mental facility by a parent or guardian, subject to review by a neutral factfinder, as a voluntary admission. *Parham v. J.R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979); *Pennsylvania v. Institutionalized Juveniles,* 442

U.S. 640, 99 S.Ct. 2523, 61 L.Ed.2d 142 (1979). However, as we discuss more fully in Section IIB, *infra,* minor children simply do not stand in the same position as adults with their parents. The traditional interrelationship of interests shared by parents and their minor children is not as presumptive as the minor passes from childhood to adulthood.

■ Likewise, the notion that the continuing confinement of the class members is voluntary notwithstanding the possible involuntariness of their initial confinement is, at best, an illusion. Indeed, the practice of relying upon some affirmative act on the part of profoundly and severely retarded persons to signal their will to escape confinement, coupled with the presence of a parent or guardian who may have played a pivotal role in institutionalizing the admittee in the first instance, creates a quite palpable danger that the adult child will be "lost in the shuffle." Cf. *Parham,* 442 U.S. at 619, 99 S.Ct. at 2513. We decline to adopt a measure of voluntariness for the commitment of adults that favors form over substance.[4] Therefore, we agree with the district court that the commitment of mentally retarded adults by the Commonwealth upon application by a parent or guardian is to be considered involuntary.[5]

### B.

The district court, relying upon the analysis of *Clark v. Cohen,* 613 F.Supp. 684 (E.D.Pa.1985), *aff'd,* 794 F.2d 79 (3rd Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986) (and its predecessor, *Dixon v. Attorney General of Commonwealth of Pennsylvania,* 325 F.Supp. 966 (M.D.Pa.1971)), held that it would be a violation of due process for the

---

4. For the same reasons, we cannot conclude, as amici argue, that the due process protections which are a part of the formal guardianship hearing, KRS 387.500 *et seq.,* vitiate the need for a hearing at the time of commitment. Moreover, the drastic curtailment of liberty which physical commitment represents makes a guardianship proceeding, which may have occurred at some time long before the actual confinement, a poor substitute for a contemporaneous hearing.

5. Of course, because these admissions are involuntary, a determination must be made pursuant to § 202B.040 that the admittee presents a danger or a threat of danger to self or others, that confinement in a hospital or RTC represents the least restrictive alternative mode of treatment, and that reasonably beneficial treatment is in fact available at a hospital or RTC. The statute, while not explicit, seems to contemplate that the interdisciplinary committee would make such a determination.

Commonwealth to involuntarily commit a mentally retarded adult without a prior *judicial* hearing. Memorandum Opinion at 4. On appeal, the Commonwealth argues that the due process claim asserted by appellees is controlled by *Parham, supra.*

In *Parham,* the Supreme Court held that the admission of minors to state mental health facilities by their parents was constitutional so long as an "inquiry [was] made by a 'neutral factfinder' to determine whether the statutory requirements for admission [were] satisfied." 442 U.S. at 606, 99 S.Ct. at 2506. The court found that a formal or informal hearing was not required, and explicitly endorsed the use of informal, traditional medical investigative techniques. 442 U.S. at 607, 99 S.Ct. at 2506. However, we do not view *Parham* as controlling. The Court in *Parham* was concerned with the commitment of minor children, and its conclusions flow more or less naturally from the unique and traditional relationship shared between parent and child. 442 U.S. at 602–03, 99 S.Ct. at 2504–05; *Clark v. Cohen,* 613 F.Supp. at 699. "Once someone becomes an adult, one's parents lose that degree of authority found so crucial in *Parham." Clark,* 613 F.Supp. at 699. Moreover, the interest of the parents in avoiding "significant intrusion into the parent-child relationship," as noted in *Parham,* 442 U.S. at 610, 99 S.Ct. at 2508, is simply not as great in the case of an adult.

We recognize that the decision to commit a person because of mental retardation is, to a large degree, medical in nature. As noted in *Parham,* "neither judges nor administrative hearing officers are better qualified than psychiatrists to render psychiatric judgments." 442 U.S. at 607, 99 S.Ct. at 2507. However, "[t]he medical nature of the inquiry ... does not justify dispensing with due process requirements. It is precisely the subtleties and nuances of psychiatric diagnoses that justify the requirement of adversary hearings." *Vitek v. Jones,* 445 U.S. at 495, 100 S.Ct. at 1265. Although dispensing with an adversary proceeding may be justified in the case of a child, we cannot conclude that adults stand in the same position.

However, we also cannot agree with the conclusion of the district court that, because *Parham* is not controlling, due process requires that adults who are involuntarily committed are entitled to a *judicial* hearing. Although, as a matter of policy, precommitment review by a judicial officer would ensure the most vigorous protection of the mentally retarded, and thus, might be preferable, it has been noted in a variety of situations that due process does not require that the neutral trier of fact be legally trained or a judicial or administrative officer. *Parham,* 442 U.S. at 607, 99 S.Ct. at 2506; *Morrissey v. Brewer,* 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972) (parole revocation hearing); *Goldberg v. Kelly,* 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970) (hearing prior to termination of AFDC benefits).

In identifying those procedures which are required to ensure due process, we are guided by the Supreme Court's opinion in *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). In *Vitek,* a convicted felon was transferred from a state prison to a mental facility under a state statute which allowed the Director of Correctional Services to effectuate such a transfer upon a finding by a designated physician or psychiatrist that a prisoner "suffers from a mental disease or defect" and "cannot be given proper treatment" in the prison itself. 445 U.S. at 483–84, 100 S.Ct. at 1258–59. In affirming the district court's holding that the statute, as applied to the prisoner, deprived him of due process, the Supreme Court approved the district court's requirement of the following minimum procedures:

1. Written notice to the prisoner that a transfer to a mental hospital is being considered;

2. A hearing, sufficiently after the notice to permit the prisoner to prepare, at which disclosure to the prisoner is made of the evidence being relied upon for the transfer and at which an opportunity to be heard in person

and to present documentary evidence is given;

3. An opportunity at the hearing to present testimony of witnesses by the defense and to confront and cross-examine witnesses called by the State;

4. An independent decisionmaker; [6]

5. A written statement by the factfinder as to the evidence relied on and the reasons for transferring the inmate;

6. Qualified and independent assistance must be provided to the inmate.

445 U.S. at 494–95, 100 S.Ct. at 1264–65.

Without question, due process requires that mentally retarded adults in Kentucky receive, at a minimum, the procedural safeguards listed above. If these basic safeguards are required before an inmate is transferred from a prison to a mental hospital, surely a person thought to be mentally retarded must be afforded at least the same level of protection before being removed from an ostensibly unfettered existence in society to the confines of an institution. See Morris, The Supreme Court Examines Civil Commitment Issues: A Retrospective and Prospective Assessment, 60 Tul.L.Rev. 927, 942 (1986).

■ Under the current statutory procedure for the involuntary commitment of adults in Kentucky, however, there is no formal mechanism for providing notice, and no method of assuring that the adequacy of notice is related to the time which the potential admittee would require to prepare for the hearing. There is no procedure whereby the admittee may present witnesses or documentary evidence, nor is there a clear opportunity for cross-examination. No independent assistance is allowed by the statute.[7] Moreover the parent or guardian of the person to be committed is allowed to be a member of the interdisciplinary team, which poses a serious threat to impartiality. Ken.Rev.Stat.Ann. § 202B.010(1) (1986). Therefore, although we do not conclude that a judicial hearing is required, we agree with the district court's conclusion that the current procedure does not conform with due process.

### III.

■ The Equal Protection Clause of the Fourteenth Amendment requires "that all persons similarly situated should be treated alike." Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). If a state enacts legislation which treats different classes of people differently, the classification drawn by the statute must be rationally related to a legitimate state purpose. 473 U.S. at 440, 105 S.Ct. at 3254. The district court held that the denial of a judicial hearing deprived appellees of equal protection under the laws. We agree.

The Commonwealth has not demonstrated that it has any rational basis for distinguishing between the mentally ill and the mentally retarded with regard to a judicial determination of their eligibility for civil commitment. We recognize that, as a matter of fact, there are differences between the mentally ill and the mentally retarded. See Kremens v. Bartley, 431 U.S. 119, 135–36, 97 S.Ct. 1709, 1718–19, 52 L.Ed.2d 184 (1977). However, the mere identification of differences is not enough; equal protection "require[s] that a distinction made have some relevance to the purpose for which the classification is made." Baxstrom v. Herold, 383 U.S. 107, 111, 86 S.Ct. 760, 763, 15 L.Ed.2d 620 (1966).

The Commonwealth identifies two interests which it argues are served by the distinction it draws between the mentally

---

6. Moreover, the independent decisionmaker must have the authority to implement its decision. See Parham, 442 U.S. at 607, 99 S.Ct. at 2506; Clark v. Cohen, 794 F.2d at 86.

7. The statute anticipates that the parent or guardian would participate in the process; however, such assistance could hardly be deemed to be independent. See Lessard v. Schmidt, 349 F.Supp. 1078, 1098–99 (E.D.Wis.1972), vacated and remanded for a more specific order, 414 U.S. 743, 94 S.Ct. 713, 38 L.Ed.2d 661, order on remand, 379 F.Supp. 1376 (E.D.Wis.1974), vacated and remanded on other grounds, 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), order reinstated on remand, 413 F.Supp. 1318 (E.D. Wis.1976).

ill and the mentally retarded: (1) an interest in not imposing unnecessary procedural obstacles which might prohibit legal guardians from seeking available services for their mentally retarded wards; and (2) its interest in prioritizing diagnostic and service resources to the mentally retarded as soon as possible instead of expending resources in time-consuming procedures prior to admission. However, surely these interests apply to the mentally *ill* as well; the Commonwealth cannot show that the *distinction* which is drawn is rationally related to its stated purposes. *Baxstrom*, 383 U.S. at 111–12, 86 S.Ct. at 762–63; *see Jackson v. Indiana*, 406 U.S. 715, 724, 92 S.Ct. 1845, 1851, 32 L.Ed.2d 435 (1972). Therefore, we agree with the district court that equal protection requires the Commonwealth to provide a judicial hearing to appellees, either upon admission, or, if now committed, when they reach adulthood.

## IV.

Appellants further argue that the district court erred in holding that periodic judicial review over the course of commitment was required by equal protection. Appellees, in response, interpret the opinion below as holding that the requirements of equal protection *and* due process mandated periodic judicial review. However, one could conclude from a fair reading of the Memorandum Opinion that the district court did not in fact rule on this issue. After a discussion of the difference between the prospects of recovery for the mentally ill and the mentally retarded, and after noting that "this fundamental difference seems to indicate that the state could prescribe different modes of due process for the review of the commitment of severely and profoundly mentally retarded adults versus the review of the commitment of mentally ill adults," Memorandum III at 8–9, it goes on to conclude:

> However, it is not our duty to spell out at this juncture what such due process procedures might be, and we have not yet been cited to any statute or decision

which the parties contend controls the review rights of the mentally retarded adults.

Our only function at this time is to hold that there must be some judicial review, at some appropriate time, of the commitment of persons who are eighteen years or older and who are mentally retarded. Suffice to say that the statute, as it now stands, is unconstitutional with respect to the right to a judicial hearing of mentally retarded adults prior to their involuntary commitment. *Clark v. Cohen*, 613 F.Supp. 684 (E.D.Pa.1985).

Memorandum III at 9.

A fair reading of this section of the opinion would seem to indicate that the phrase "judicial review" in the above quote refers to the district court's conclusion that due process and equal protection, require that, at *some* point, a judicial determination must be made. It is not at all clear that the district court held that due process or equal protection required *periodic* judicial review; indeed, given the fact that the district court recognized that legitimate and relevant factors distinguished the mentally ill and the mentally retarded concerning the efficacy of treatment once they were committed, it at least seems unlikely that appellant's interpretation is correct. However, because both parties have concluded, through their respective interpretations, that there was a holding on this issue, and because both interpretations are at least conceivable from a reading of the Memorandum Opinion, we shall discuss whether due process or equal protection requires periodic judicial review.[8]

### A.

■ Our discussion of judicial hearings at admission as a requirement of due process, Section IIB, *supra*, is applicable to our analysis here. If one has no due process right to a judicial hearing before one is initially committed, logic dictates that no such right exists during the period of confinement. Of course, because involuntary confinement cannot continue after the ba-

---

8. Also, there is little point in reserving the issue for another day, as it is a virtual certainty that this court shall be required to address it at some juncture.

sis for that confinement ceases to exist, due process requires that *some* periodic review take place during confinement. *See O'Connor v. Donaldson*, 422 U.S. 563, 574–75, 95 S.Ct. 2486, 2493–94, 45 L.Ed.2d 396 (1975). However, as in the case of the initial admission, we cannot say that due process requires a periodic *judicial* review.

### B.

■ As the district court noted, for purposes of equal protection analysis of the requirement for periodic review, "it is recognized that mentally ill persons may recover from their mental illnesses within relatively short periods after their ... commitment, whereas severely and profoundly mentally retarded persons very rarely experience such dramatic improvements in their condition." Memorandum at 8–9. Thus, there may be constitutionally valid reasons for providing different methods of periodic review for the mentally retarded and the mentally ill. However, we see no legitimate interest of the Commonwealth which would justify denying the mentally retarded periodic judicial review while providing the same to the mentally ill. Therefore, the Commonwealth must make a judicial review procedure available to the mentally retarded.[9]

### V.

Therefore, for the foregoing reasons, we REVERSE the judgment of the district court inasmuch as it mandates a judicial hearing prior to commitment and periodic judicial review as requirements of due process, and REMAND this issue to the district court to allow it an opportunity to revise the grant of partial summary judgment in a manner consistent with this opinion. In all other respects, the judgment below is AFFIRMED.

---

9. The task of resolving how that procedure may differ from that provided to the mentally ill is one best left to the district court, as it will have the benefit of plans submitted by the parties, and can make findings of fact concerning the relative prognoses of the mentally retarded and the mentally ill.