[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-14212

_____

D.C. Docket No. 4:11-cv-00417-WS-CAS

J.R.,

Plaintiff-Appellant,

versus

MICHAEL HANSEN, in his
Official Capacity as Director of the Agency
for Persons with Disabilities,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(October 15, 2015)

Before MARTIN and FAY, Circuit Judges.[*]

MARTIN, Circuit Judge:

_____

[*] This opinion is issued as a quorum.  See 28 U.S.C. § 46(d); 11th Cir. R. 34-2.

Two years ago we certified questions to the Florida Supreme Court about that State's scheme for the involuntary commitment of the intellectually disabled. J.R. v. Hansen, 736 F.3d 959 (11th Cir. 2013) (J.R. I).  Today we revisit this appeal with the benefit of that court's answers.  See J.R. v. Palmer, ___ So. 3d ___, 2015 WL 2236760 (Fla. May 14, 2015) (J.R. II).  We hold that the statutory scheme, as definitively interpreted by the Florida Supreme Court, is facially unconstitutional because it violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

## I.    Background

### A.    The Statutory Framework

J.R. claims that Florida law denies due process because it permits the State to keep intellectually disabled people like him involuntarily committed indefinitely without periodic review.  Florida's statutory framework for involuntarily committing the intellectually disabled is somewhat complicated, involving several interlocking provisions.

Chapter 393 of the Florida Statutes provides for the treatment of people with "developmental disabilities."  Fla. Stat. § 393.062; J.R. II, 2015 WL 2236760, at *4.  The chapter gives the Agency for Persons with Disabilities (APD) authority to provide both voluntary and involuntary treatment.  Fla. Stat. §§ 393.063(1), .065, .11; J.R. II, 2015 WL 2236760, at *4.  Section 393.11 governs the involuntary

2

admission of people who are intellectually disabled to non-secure residential facilities.[1]  It provides:

> If a person has an intellectual disability and requires involuntary admission to residential services provided by the agency, the circuit court of the county in which the person resides has jurisdiction to conduct a hearing and enter an order involuntarily admitting the person in order for the person to receive the care, treatment, habilitation, and rehabilitation that the person needs.[2]

A state circuit court may involuntarily admit a person only if, after a hearing, see § 393.11(7), it makes three findings relevant here: (1) the person is intellectually disabled; (2) a residential setting is the least restrictive and most appropriate way to meet the person's needs; and (3) the person is likely to injure himself or others if not admitted, § 393.11(8)(b).[3]

---

[1] "Residential facilities" "provid[e] room and board and personal care for persons who have developmental disabilities."  Fla. Stat. § 393.063(28).

[2] Section 393.11 does not specify whether the residential facilities are "secure" or "non-secure."  But a separate statute not relevant here, Fla. Stat. § 916.303(3), contemplates placement in secure facilities under different admission standards.  Compare id. (referring to "secure" facilities), with § 393.11 (mentioning neither "secure" nor "non-secure").  The parties and the District Court have assumed that § 393.11 concerns admission to non-secure facilities, so we do the same.

[3] This general description in text suffices for our purposes.  For the inquisitive, the statute provides in full:

> An order of involuntary admission to residential services may not be entered unless the court finds that:
> 1. The person is intellectually disabled or autistic;
> 2. Placement in a residential setting is the least restrictive and most appropriate alternative to meet the person's needs; and
> 3. Because of the person's degree of intellectual disability or autism, the person:
>     a. Lacks sufficient capacity to give express and informed consent to a voluntary application for services pursuant to [§] 393.065 and lacks basic survival and self-care skills to such a degree that close

3

Shortly after a person is admitted, the APD must give a "support plan" to the circuit court that ordered admission. § 393.11(8)(e). Section 393.0651, which governs support plans, says that "[t]he ultimate goal of each [support] plan, whenever possible, shall be to enable the client[4] to live a dignified life in the least restrictive setting, be that in the home or in the community." A support plan may call for the APD to place a client in a variety of settings, from very restrictive and costly to quite permissive and inexpensive (to the State, at least). § 393.0651(5) (listing six possible placements, ranging from a "[d]evelopmental disabilities center"[5] to the "[c]lient's own home or the home of a family member or direct service provider"). The APD must initially develop a support plan in consultation with the client, his parent or guardian, or his appointed advocate. Id. It must then review and revise each client's support plan each year based on his progress in achieving the objectives of his earlier support plans. § 393.0651(7).

_____

supervision and habilitation in a residential setting is necessary and, if not provided, would result in a real and present threat of substantial harm to the person's well-being; or
b. Is likely to physically injure others if allowed to remain at liberty.

[4] A person who is involuntarily admitted is called a "client." § 393.063(5); see also J.R. II, 2015 WL 2236760, at *4.

[5] A "[d]evelopmental disabilities center" is a "state-owned and state-operated facility . . . providing for the care, habilitation, and rehabilitation of clients with developmental disabilities." § 393.063(10)

4

Importantly, the circuit court that first orders a person involuntarily admitted keeps jurisdiction over the admission order, and the admitted person "may not be released . . . except by order of the court." § 393.11(11).  And the court is never required to review a continuing involuntary admission.  Compare Fla. Stat. § 916.303(3) (mandating that admissions to a secure facility, which are not at issue here, "must be reviewed by the court at least annually at a hearing"), with § 393.11 (containing no similar requirement); see also J.R. II, 2015 WL 2236760, at *9.

A person who is involuntarily admitted under § 393.11 thus has little recourse to challenge the admission.  If he disagrees with his support plan, he may challenge it in an administrative proceeding, § 393.0651(8), but the administrator cannot change or vacate the order of involuntary admission or order release.  As we have said, only the circuit court can do that.  § 393.11(11); see also J.R. II, 2015 WL 2236760, at *9.  The only avenue for relief from the order of admission is by way of habeas corpus: an involuntarily admitted person may challenge the admission order by filing a habeas corpus petition with the circuit court that signed the order in the first instance.  § 393.11(13); J.R. II, 2015 WL 2236760, at *8.

**B.    J.R.**

J.R. is an intellectually disabled man with an IQ of 56.  He functions as a seven-year-old.  "Although J.R.'s [intellectual disability] will always exist, his potential for dangerousness . . . can change."  In 2000 J.R. was charged with sexual

5

battery in Lee County, Florida.  The Lee County Circuit Court found J.R. incompetent to stand trial and involuntarily admitted him to the Department of Children and Family Services (the precursor to the APD, J.R. II, 2015 WL 2236760, at *1 n.1).  In 2004 J.R. was involuntarily admitted to non-secure residential services under § 393.11.  The order involuntarily admitting J.R. contains no end date.

J.R. has lived in several different settings since his admission.  While J.R.'s commitment is characterized by the statutory scheme as "non-secure," his liberty is substantially limited.[6]  As the District Court explained by way of example: "[i]f he were to 'elope,' the police would probably be called to return him" to his group home.  Beyond that, J.R. "is subject to a daily curfew of 10 p.m."; he cannot drink alcohol; he had to "earn" the right to leave his group home, and when he does leave "he must always inform the . . . staff exactly where he is going, the purpose of his trip, and when he will return."  If he does not comply with these requirements, "he may lose his right to freedom of movement."  While the precise

---

[6] The APD insists that J.R. is merely "admitted," not "committed."  It says that the "use of the term 'commitment' implies a more restrictive living setting than the community setting that J.R. has maintained."  Quoting Black's Law Dictionary, the APD maintains that "commitment" necessarily implies confinement to a prison, mental hospital, or other institution. We are not so sure that involuntary "admission" to a residential group home does not fit within that definition.  But even if it does not, this argument is semantic wrangling.  The APD is trying to make a distinction between "commitment" and "admission," but even if a distinction exists it would make no difference to this appeal.  Whether we call it "commitment" or "assignment" or something else altogether (perhaps "free rent"), the substance of the action is the same: the State exercises its sovereignty to force J.R. to live in a place he does not want to live, and prevents him from leaving.  That is a curtailment of his liberty by any name.

restrictions on J.R.'s liberty have changed and may continue to change with the annual revision of his support plan,[7] the circuit court has not held a hearing about J.R.'s commitment since 2005.  Neither has J.R. filed a habeas petition seeking release.

## C.    Procedural History

In 2011 J.R. filed suit under 42 U.S.C. § 1983 against Michael Hansen, the Director of the APD.[8]  He alleged that Florida's statutory scheme denies due process because it permits indefinite involuntary commitment without periodic review by a decision-maker with authority to order release.[9]

On cross motions for summary judgment, the District Court held that the statutory scheme was constitutional.  It rested its holding largely on its belief that § 393.11, properly interpreted, contains an implicit requirement that if a committed person no longer meets the admission criteria, the APD must petition the circuit court to order release.  Because the scope of the APD's responsibilities under the statute was (and is) critical to the constitutional inquiry, and because making that

---

[7] For example, under J.R.'s most recent support plan, he was able to move to a new residence closer to his family.  But there has been no release recommendation.

[8] After J.R. filed his notice of appeal, Mr. Hansen resigned as the Director of the APD; he was replaced by Barbara Palmer.  At all relevant times the APD has defended J.R.'s suit.  For that reason, we refer to the Defendant-Appellee as "the APD."

[9] J.R. does not argue that the initial admission process is unconstitutional.  He objects only to ongoing commitment without periodic review.

determination was (and is) a question requiring interpretation of Florida law, we certified questions to the Florida Supreme Court.  J.R. I, 736 F.3d at 974.[10]

We now have that court's answer.  It turns out that the District Court was mistaken.  Florida law contains no requirement, explicit or implicit, that the APD review the continuing commitment of intellectually disabled persons.  J.R. II, 2015 WL 2236760, at *1.  Neither does Florida law require that the APD petition the admitting circuit court to release a person who no longer meets the criteria for commitment.  Id.  Because the Florida Supreme Court "is unquestionably the ultimate expositor of [Florida] law," Riley v. Kennedy, 553 U.S. 406, 425, 128 S. Ct. 1970, 1985 (2008) (alteration adopted) (quotation omitted), we are bound by its conclusive interpretation of § 393.11.

## II.    Standard of Review

"We review de novo the district court's rulings on the parties' cross motions for summary judgment."  Owen v. I.C. Sys., Inc., 629 F.3d 1263, 1270 (11th Cir. 2011).  A plaintiff challenging a law as facially unconstitutional "must establish that no set of circumstances exists under which the [law] would be valid."  Horton v. City of St. Augustine, Fla., 272 F.3d 1318, 1329 (11th Cir. 2001) (quotation omitted).

---

[10] "When substantial doubt exists about the answer to a material state law question upon which the case turns, a federal court should certify that question to the state supreme court . . . to offer the state court the opportunity to explicate state law."  Forgione v. Dennis Pirtle Agency, Inc., 93 F.3d 758, 761 (11th Cir. 1996) (per curiam).

8

### III.    Discussion

A state shall not "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV, § 1.  "The Due Process Clause provides two different kinds of constitutional protections: procedural due process and substantive due process."  Maddox v. Stephens, 727 F.3d 1109, 1118 (11th Cir. 2013).  Procedural due process is, as its name suggests, "a guarantee of fair procedure."  Zinermon v. Burch, 494 U.S. 113, 125, 110 S. Ct. 975, 983 (1990).  J.R. brings a procedural due process claim.  See McKinney v. Pate, 20 F.3d 1550, 1555 (11th Cir. 1994) (en banc) (procedural due process claim may form the basis of a § 1983 suit).  "[A] § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally[] inadequate process."  Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003).  The APD concedes that the first two elements of the procedural due process inquiry are met here.  The question for us is whether § 393.11 provides constitutionally adequate process.

### A.    Constitutionally Adequate Process

A state must release a person who is involuntarily committed if the grounds for his commitment cease to exist.  See O'Connor v. Donaldson, 422 U.S. 563, 574–75, 95 S. Ct. 2486, 2493 (1975); cf. Jackson v. Indiana, 406 U.S. 715, 738, 92

9

S. Ct. 1845, 1858 (1972) ("[D]ue process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."). But that requirement—release the committed when they deserve to be let out—is toothless if a state does not periodically review whether the grounds for commitment are met. That is, a state could get around the timely-release requirement by simply refusing to ever consider the continued propriety of commitment. To effectuate that requirement, then, the state must undertake some form of periodic review. See Parham v. J.R., 442 U.S. 584, 607, 99 S. Ct. 2493, 2506 (1979).[11]

But what form of review is constitutionally adequate? To answer that question, courts turn to the balancing test from Mathews v. Eldridge, 424 U.S. 319, 96 S. Ct. 893 (1976), which requires consideration of several factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

---

[11] Accord, e.g., Doe v. Austin, 848 F.2d 1386, 1396 (6th Cir. 1988) (explaining that "due process requires that some periodic review take place during" a continued involuntary commitment); Clark v. Cohen, 794 F.2d 79, 86 (3d Cir. 1986) (explaining that a plaintiff "was entitled to periodic review of her commitment"); cf. Williams v. Wallis, 734 F.2d 1434, 1438 (11th Cir. 1984) (upholding a scheme that provided periodic review of continued commitment and remarking that "[t]he frequency of the evaluations also reduces the risk that the patient will be confined any longer than necessary"); Hickey v. Morris, 722 F.2d 543, 549 (9th Cir. 1983) (holding that a statute adequately protected a plaintiff's liberty because it required "regular review of his continued confinement").

Id. at 335, 96 S. Ct. at 903.

The Mathews test is stated at a high level of generality. It does not provide much guidance for this (or any) specific context. And constitutionally adequate process, the Supreme Court has said, is a flexible concept that "cannot be divorced from the nature of the ultimate decision that is being made." Parham, 442 U.S. at 608, 99 S. Ct. at 2507.

## B.    Supreme Court and Eleventh Circuit Precedent

So we are grateful to have two cases, one from the Supreme Court and one from a panel of this Court, which are especially instructive in helping us consider what process is constitutionally adequate after involuntary civil commitment: Parham v. J.R. (no relation) and Williams v. Wallis.

In Parham, the Supreme Court considered constitutionally adequate process before and after the voluntary commitment of children to state hospitals by their parents. 442 U.S. at 587, 99 S. Ct. at 2496. A plaintiff class of committed children challenged Georgia's scheme, arguing that they had a right to notice and a hearing before commitment. Id. at 587–88 & n.2, 99 S. Ct. at 2496–97 & n.2. Though the Supreme Court upheld Georgia's practice, it wrote this:

> We conclude that the risk of error inherent in the parental decision to have a child institutionalized . . . is sufficiently great that some kind of inquiry should be made by a "neutral factfinder" to determine [if] the statutory requirements for admission are satisfied. . . . It is necessary that the decisionmaker have the authority to refuse to admit any child who does not satisfy the medical standards for admission. Finally, it

11

is necessary that the child's continuing need for commitment be
reviewed periodically by a similarly independent procedure.

Id. at 606–07, 99 S. Ct. at 2506 (emphasis added).  Two things made the state
scheme constitutionally adequate: review of an initial admission by a decision-
maker with authority to refuse admission, and, after admission, periodic review of
the continuing need for commitment.[12]

It is true that the plaintiffs in Parham focused on the initial deprivation of
liberty caused by admitting children, rather than by keeping them committed, as
here.  But in its opinion the Supreme Court spoke several times about the
requirements for continuing commitment.  It explained that Georgia's law
"charged [hospital superintendents] with an affirmative statutory duty to discharge
any child who is no longer . . . in need of therapy," id. at 615, 99 S. Ct. at 2510,
"[e]ven without a request for discharge," id. at 591, 99 S. Ct. at 2498.  And the
Court linked that ongoing affirmative duty to its conclusion that the initial
deprivation of liberty was constitutional: "We have held that the periodic reviews
described in the record reduce the risk of error in the initial admission and thus
they are necessary."  Id. at 617, 99 S. Ct. at 2511 (emphasis added); see also id. at

---

[12] Parham did not require a judicial or even administrative hearing.  Because the
question—whether the child meets the commitment criteria—was a medical one, the Court held
that review by a "physician will suffice, so long as he or she is free to evaluate independently the
child's mental and emotional condition and need for treatment."  Id. at 607, 99 S. Ct. at 2507.
The Court explained that the State had an interest in ensuring that its doctors spent their time
treating patients, not preparing for court.  Id. at 605–06, 99 S. Ct. at 2506; see also id. at 606, 99
S. Ct. at 2506 ("Behavioral experts in courtrooms and hearings are of little help to patients.").

607, 99 S. Ct. at 2506 ("It is necessary that the child's <u>continuing need for commitment</u> be reviewed periodically . . . ." (emphasis added)).

After <u>Parham</u>, in <u>Williams v. Wallis</u>, this Court addressed what process a state must give to people who have been involuntarily committed on a continuing basis. The plaintiffs in <u>Williams</u> challenged "Alabama's procedures for the release of patients committed to the State's mental health system after being found not guilty of a criminal offense by reason of insanity." 734 F.2d at 1436. Alabama assigned to each committed person a "treatment team" of medical professionals that would "devise[] an individualized treatment plan" with the stated goal of "transfer[ring] [the person] to a less restrictive environment and [securing his or her] eventual release." Id. The treatment team reviewed the person's progress every 60 to 90 days. Id. We described the process by which a committed person (an "acquittee") would be released:

> The decision to release an acquittee is usually initiated by the treatment team. . . . After the team recommends release, an acquittee not classified as special can be released with the approval of the forensic unit director of the hospital to which he is committed. The proposed release of special patients[13] must be reviewed by the hospital's superintendent or his designee. The reviewing authority may communicate the proposed release to the committing court, the district attorney, the acquittee's family, and others, or may order further treatment for, or evaluation of, the acquittee. The hospital superintendent then makes the final decision whether to release the special patient.

---

[13] "Special patients" were those who were "considered dangerous to themselves or others." See <u>Williams</u>, 734 F.2d at 1436.

Id.

The plaintiffs claimed that this release process was unconstitutional because it did not require an adversary proceeding in which the State bore the burden of proof. Id. at 1437. But, looking to Parham, we held that due process does not demand an adversary proceeding. See id. at 1438–39. We explained:

> Hospitals and their medical professionals certainly have no bias against the patient or against release. Therefore, we can safely assume they are disinterested decision-makers. In fact, the mental health system's institutional goal—i.e., transfer to a less restrictive environment and eventual release—favors release. Other factors also favor release, including a perennial lack of space and financial resources, which militates against any motivation to unnecessarily prolong hospitalization, and including the medical professional's pride in his own treatment. The frequency of the evaluations also reduces the risk that the patient will be confined any longer than necessary.

Id. at 1438 (emphasis added).

We went on to explain that requiring an adversary proceeding "would have a natural tendency to undermine the beneficial institutional goal of finding the least restrictive environment including eventual release." Id. at 1439 (emphasis added). Finally, we observed that Alabama provided a habeas corpus remedy as a "secondary or backup procedure, a safeguard" that existed to "rectify any error that might have occurred during the initial nonadversary review." Id. at 1440.

From this precedent we have synthesized several guiding principles. At the outset, as we have explained, it is clear that the State must conduct some form of periodic review of continuing involuntary commitments. See Parham, 442 U.S. at

14

607, 99 S. Ct. at 2506 ("[I]t is necessary that the child's continuing need for commitment be reviewed periodically by a[n] . . . independent procedure.").

Yet this still leaves the question we posed above: what type of periodic review is constitutionally adequate?  It is clear that the review need not consist of an adversarial proceeding involving a judge or even an administrator.  See Parham, 442 U.S. at 607–08, 99 S. Ct. at 2506–07; Williams, 734 F.2d at 1439; see also Austin, 848 F.2d at 1396 (holding that "due process requires that some periodic review take place" but not necessarily "a periodic judicial review"); Hickey, 722 F.2d at 549 ("Due process does not always require an adversarial hearing.").

But the cases impose two related restrictions on the form of review, at least where it is nonadversarial.  First, the reviewer must be required to consider the propriety of ongoing commitment.  See Parham, 442 U.S. at 615, 99 S. Ct. at 2510 (noting that the hospital superintendent "is charged with an affirmative statutory duty to discharge any child who is no longer mentally ill or in need of therapy"); Williams, 734 F.2d at 1439 (observing that periodic reviews seek to meet the "goal of finding the least restrictive environment including eventual release" (emphasis added)); see also Hickey, 722 F.2d at 549 (holding that adequate procedures included "regular review of [the plaintiff's] continued confinement"); cf. Austin, 848 F.2d at 1395–96 (explaining that periodic review must include whether

15

commitment should continue); Clark, 794 F.2d at 86 (describing that the periodic reviews considered whether to release the plaintiff).

Second, the reviewer must be authorized to order release if the criteria for commitment are no longer met. See Parham, 442 U.S. at 607, 99 S. Ct. at 2506 ("It is necessary that the decisionmaker have the authority to refuse to admit any child who does not satisfy the medical standards for admission."); Williams, 734 F.2d at 1440 ("[T]he release decision is first addressed in the nonadversary proceedings described above, and the final release decision can be, and most often is, made at this level by the hospital professionals." (emphasis added)).[14]

For instance, in Clark the Third Circuit considered a review scheme that violated this second restriction. There, medical professionals periodically reviewed the plaintiff's continued confinement and had "consistently recommended that [she] be released" for something like eight years. Clark, 794

_____

[14] The APD argues that Williams does not stand for the proposition that the reviewer must be authorized to order release. It is true that in that case the "treatment team" was responsible for periodically reviewing continued involuntary commitment, but the treatment team could only "recommend[] release." Williams, 734 F.2d at 1436; see also id. ("The decision to release an acquittee is usually initiated by the treatment team." (emphasis added)). A hospital supervisor had to approve the treatment team's release recommendation before the person could actually be released. See id. (explaining that the treatment team's release recommendation for "special patients" was reviewed by "the hospital's superintendent or his designee," while the release recommendation for non-special patients was approved by "the forensic unit director of the hospital to which [the acquittee] [wa]s committed"). But it was the same group of medical professionals that reviewed the propriety of commitment and that, as a whole, had authority to order release. There was no requirement that the medical professionals petition a court to order release, or that some other entity without any say in the medical-review process approve release. The distance between the reviewer and the person with authority to release was vanishingly small in Williams: from medical professionals to their supervisors. Here the distance is vast: medical professionals must petition a state court to order release.

16

F.2d at 86.  But she was not released because "the reviewers lacked the authority to implement their recommendations."  Id.  The Third Circuit found a violation of due process.  Id.  It explained that the review "required by the due process clause is not a moot court exercise.  The [reviewers] must have the authority to afford relief."  Id.; see also id. (finding a violation of procedural due process because "[o]ver the course of more than twenty-eight years [the plaintiff] was never afforded a hearing before any decisionmaker with authority to resolve her dispute").

Finally, the cases suggest that habeas corpus may serve as a backup to periodic, nonadversarial review.  See Williams, 734 F.2d at 1440; see also Hickey, 722 F.2d at 549 (explaining that periodic, nonadversarial review is constitutional because a committed person can "receive judicial review under the court's discretionary power or may [petition for] habeas relief").  But no case has permitted habeas to be the primary review procedure.  We assume this is because habeas is by its very nature not a periodic, state-initiated review, which, as we have just explained, is required.  See Parham, 442 U.S. at 607, 99 S. Ct. at 2506.

## C.    Application

With these guiding principles in mind, our task is to determine whether Florida's scheme provides constitutionally adequate process.  We conclude that it does not.  Section 393.11 is constitutionally infirm because it does not require periodic review of continued involuntary commitment by a decision-maker with

17

the duty to consider and the authority to order release.  Such a scheme runs afoul of Mathews, Parham, and Williams, and is unconstitutional on its face.

The APD offers several responses that it says undermine this conclusion, but none persuades us.  First, at oral argument it insisted that § 393.11 contains "implied" review obligations.  But as we now know, with the benefit of the Florida Supreme Court's answers to our certified questions, the APD is mistaken in this understanding.  The supreme arbiter of Florida law has told us in no uncertain terms that the statutory scheme contains no such implied obligations.  J.R. II, 2015 WL 2236760, at *8 (holding that the APD "is not required under either section 393.0651 or section 393.11 . . . to petition the circuit court for a person's release from an involuntary admission order in cases where the [APD] determines that the circumstances that led to the initial admission order have changed").

Nevertheless, the APD argues that the support-plan review process provides the required periodic review.  "Similar to the 'treatment teams' described in Williams," the APD says, "the client and the client's providers may use the support plan to recommend further review of a client's order of involuntary admission." (Emphasis added.)  This may be true.  But the fact that the State "may use" the annual support-plan review to "recommend" that the circuit court consider the propriety of continuing involuntary commitment is not enough.  The Constitution demands that when a state exercises its power to involuntarily commit its citizens

18

on an ongoing basis, it must <u>require</u>, not merely <u>permit</u>, review of the propriety of their commitment.

Slightly differently, the APD says that the annual support-plan review does consider the propriety of ongoing commitment, because in making the support plan the APD must evaluate the "most appropriate, least restrictive, and most cost-beneficial environment for accomplishment of the objectives for client progress." § 393.0651.  And, the APD insists, the "most appropriate, least restrictive" environment may be no commitment at all.  For that reason, it says, support-plan review necessarily considers whether to release a committed person.

We cannot agree, because the support-plan review process does not consider both admission criteria.  To initially admit a person under § 393.11, a circuit court must find <u>both</u> (1) that "[p]lacement in a residential setting is the least restrictive and most appropriate alternative to meet the person's needs" <u>and</u> (2) that the person "lacks basic survival and self-care skills to such a degree that close supervision and habilitation in a residential setting is necessary and, if not provided, would result in a real and present threat of substantial harm to the person's well-being" or would leave the person "likely to physically injure others if allowed to remain at liberty."  § 393.11(8)(b).  But the support-plan review considers only the first half of that two-part equation.  <u>See</u> § 303.0651 ("Each [support] plan must include the most appropriate, least restrictive, and most

19

cost-beneficial environment for accomplishment of the objectives for client progress . . . .").

There is no requirement that the support-plan review consider the second criterion: whether a person is dangerous to himself or others. So a committed person may cease to meet this second criterion but languish under continued commitment because the support plan does not address it. Take J.R. himself. We have no occasion to question whether he was dangerous at the time of his admission under § 393.11. The circuit court specifically found as much and that finding is not challenged here. But as we have already noted, J.R.'s "potential for dangerousness . . . can change." What happens if J.R. stops being dangerous? The APD is under no obligation to consider whether he is no longer dangerous and, if he is not, release him or even recommend release to the circuit court. In this way, Florida's scheme differs from those in Parham and Williams, where the stated purpose of the periodic reviews was to consider release. See Parham, 442 U.S. at 615, 99 S. Ct. at 2510 (noting "an affirmative statutory duty to discharge" when warranted); Williams, 734 F.2d at 1438 (describing "eventual release" as a central goal of periodic medical reviews).

In any event, we think Florida's scheme would be constitutionally suspect even if it did require the APD to periodically review whether a person is properly committed, for a simple reason: the APD does not have the authority to order

20

release.  Only the admitting circuit court has that power.  Nothing authorizes the APD to order release if it deigned to review the propriety of a person's continued commitment (which it need not), even if that review indicated that the person no longer meets the commitment criteria.  Neither, in such a circumstance, would the APD be required to ask the circuit court to consider release.

The APD finally argues that the availability of habeas corpus provides constitutionally adequate process.  But Williams makes clear that habeas corpus is not adequate in and of itself.  Habeas can be at most a backstop—a failsafe mechanism, not the sole process available.  As we have already mentioned, this makes good sense because habeas review occurs only if a petitioner asks for it; it is in no way the type of periodic review that due process requires.  See Williams, 734 F.2d at 1439; see also Austin, 848 F.2d at 1396 (holding that "due process requires that some periodic review take place").  And on a practical level, it seems fanciful to expect intellectually disabled persons to bring petitions for habeas corpus.  We agree with one of our sister Circuits that

> [n]o matter how elaborate and accurate the habeas corpus proceedings available under [state law] may be once undertaken, their protection is illusory when a large segment of the protected class [i.e., "gravely disabled" persons committed to mental institutions] cannot realistically be expected to set the proceedings into motion in the first place.

21

Doe v. Gallinot, 657 F.2d 1017, 1023 (9th Cir. 1981); see also id. at 1022–23 (rejecting the State's argument that "habeas corpus review on demand adequately protects against erroneous" commitment).

## IV.   Conclusion

We are sympathetic to the State of Florida's interest in involuntarily admitting the intellectually disabled to residential services in order to "prevent or reduce the severity of developmental disabilities" and to "enable individuals with developmental disabilities to achieve their greatest potential for independent and productive living."  § 393.062.  Those are honorable goals, and we commend the State for striving to reach them.  But we cannot sanction the State's methods.  The Constitution demands periodic review of the propriety of ongoing commitment by someone with the duty to consider and the authority to order release when appropriate.  Florida's statutory scheme does not meet those demands.

**REVERSED AND REMANDED.**