TJOFLAT, Circuit Judge, dissenting:
This conflict centers on absentee voting under Georgia law. On October 25, 2018, the United States District Court for the Northern District of Georgia-in an effort to ensure that all absentee ballots for the general election would be counted-entered a preliminary injunction that effectively rewrote Georgia's election code. Georgia's Secretary of State ("the Secretary") moved in this Court for a stay of the injunction pending appeal. We denied the Motion; I dissented, noting that an opinion *1280 would follow. I now explain my reasons for dissenting.
I.
A.
Georgia permits registered voters to vote in person on Election Day, in person early, or by mail. Ga. Code Ann. §§ 21-2-380 to - 381.[19] This case concerns the last method-voting by mail-the details of which are set out in Sections 21-2-381 and - 386 of Georgia's election code ("the Statutes").
To receive a mail-in ballot, a voter must first submit an application for a mail-in ballot. Id. § 21-2-381. When an application is received, the registrar or absentee ballot clerk shall "compare the signature or mark of the elector on the application with the signature or mark of the elector on the elector's voter registration card." Id. § 21-2-381(b)(1). If the voter is found to be eligible, a ballot is mailed out within three business days. Id. § 21-2-381(b)(2)(A) ; Ga. Comp. R. & Regs. 183-1-14-.11. But if the voter is found to be ineligible, the registrar or clerk shall "deny the application by writing the reason for rejection in the proper space on the application and shall promptly notify the applicant in writing of the ground of ineligibility." Id. § 21-2-381(b)(3).
The registrar or absentee ballot clerk follows a similar process for mail-in ballots themselves. When a mail-in ballot is received, the registrar or clerk shall
compare the signature or mark on the oath with the signature or mark on the absentee elector's voter registration card or the most recent update to such absentee elector's voter registration card and application for absentee ballot or a facsimile of said signature or mark taken from said card or application.
Id. § 21-2-386(a)(1)(B). If the signature appears to be valid, and other information appears to be correct, the ballot is certified. Id. If the signature appears to be invalid, however, the registrar or clerk "shall promptly notify the elector of such rejection." Id. § 21-2-386(a)(1)(C).
A voter whose signature is determined to be invalid receives process in the form of notice, id. §§ 21-2-381(b)(3), - 386(a)(1)(C), as well as the "opportunity to vote in the primary, election, or runoff either by applying for a second absentee ballot prior to the day before such primary, election, or runoff or by voting in person at the elector's polling place on the day of the primary, election, or runoff," Ga. Comp. R. & Regs. 183-1-14-.09(2).[20]
Plaintiffs to this suit, Betty J. Jones, a registered voter in Georgia, and various advocacy groups, allege that the process set out in the Statutes is constitutionally defective.[21] The mail-in voting scheme is a facial violation of procedural due process, they argue, because the Statutes do not *1281 set out any manner and method for appealing a determination that the signature on a mailed-in application or ballot is invalid-that is, that it fails to match the signature on record.
The District Court agreed and held that Plaintiffs were substantially likely to succeed on the merits of their procedural due process claim. The Court reasoned that Plaintiffs have a liberty interest in voting by mail-in ballot and that the balance of interests under Mathews v. Eldridge , 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the test to determine what process is due in any situation, required Defendants to provide notice and an opportunity to be heard before voters are first denied the opportunity to vote by mail-in ballot.
The District Court enjoined the Secretary to order election officials in Georgia's 159 counties to provide pre-rejection notice, to set up ad hoc administrative tribunals to adjudicate signature disputes, and to allow an attorney to stand in for voters at those proceedings. The Court also vested Georgia's superior courts, the state's trial courts of general jurisdiction, Ga. Const. art. VI, § 4, para. 1, with appellate jurisdiction over the tribunals:
The county elections official shall ... provide pre-rejection notice and an opportunity to resolve the alleged signature discrepancy to the absentee voter. This process shall be done in good faith and is limited to confirming the identity of the absentee voter consistent with existing voter identification laws. The elections official is required to send rejection notice via first-class mail and also electronic means, as available or as otherwise required by law. This process shall include allowing the absentee voter to send or rely upon a duly authorized attorney or attorney in fact to present proper identification. ... The absentee voter shall have the right to appeal any absentee ballot rejection following the outcome of the aforementioned process, as designated in [Ga. Code Ann.] § 21-2-229(e).
Ga. Muslim Voter Project v. Kemp , No. 1:18-cv-04776-LMM, slip op. at 2 (N.D. Ga. Oct. 25, 2018) (temporary restraining order) (citations omitted).
The Court also required, for mail-in ballot applications, that election officials provide voters with provisional ballots:
[F]or all ballot applications where a signature mismatch is perceived, the county elections official shall ... provide a provisional absentee ballot to the absentee voter along with information as to the process that will be followed in reviewing the provisional ballot. ... Once any provisional ballot is received, the procedure outlined in section 1 above is to be followed.
Id. at 3. A provisional ballot is a ballot issued to a voter who is unable to produce a type of statutorily enumerated identification at the polling place but who nonetheless "swear[s] or affirm[s] that the elector is the person identified in the elector's voter certificate." See Ga. Code Ann. § 21-2-417(b). The ballot is counted only if officials verify the voter's identification within the statutory timeframe. Id.
The Secretary moved in this Court under Federal Rule of Appellate Procedure 8 for a stay of the injunction pending appeal and in the alternative, for expedited appeal, both of which the majority denied.[22]
*1282 Ga. Muslim Voter Project v. Kemp , No. 18-14502-GG, slip op. at 2, 2018 WL 7822108 (11th Cir. Nov. 2, 2018). The majority believed that the Secretary had not made the requisite showing under Nken v.Holder , 556 U.S. 418, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009), which outlines the factors for determining whether a stay pending appeal is warranted.[23] Id. The panel also invoked its authority under Federal Rule of Appellate Procedure 3(b)(2) to consolidate this case and a related case, Martin v. Kemp . Ga. Muslim Voter Project , slip op. at 2 (11th Cir. Nov. 2, 2018).
B.
The District Court committed three errors, each of which reveals that the Secretary makes a "strong showing that he is likely to succeed on the merits" and that the "public interest lies" with granting the stay. See Nken , 556 U.S. at 434, 129 S.Ct. at 1761.
In Part II, I explain that Plaintiffs' claim must rise or fall as a facial challenge because, as the District Court observed, "Plaintiffs have not identified a voter to whom [the Statutes] have been unconstitutionally applied." Ga. Muslim Voter Project , slip op. at 19 (N.D. Ga. Oct. 24, 2018) (order granting temporary restraining order). But Plaintiffs have not met their burden-under precedent of both this Court and the Supreme Court-of showing that the Statutes are unconstitutional in all of their applications.
In Part III, I explain that even if I were to construe Plaintiffs' claim as an as-applied procedural due process challenge, their claim would still fail because-under the Parratt doctrine, as expounded by this Court in McKinney -the deprivations are random and unauthorized acts.[24] Because Georgia provides a constitutionally adequate remedy, the law requires Plaintiffs to seek relief in Georgia superior court, not here.
And in Part IV, I explain that even if I could conceive of a situation in which Georgia afforded Plaintiffs no remedy, the District Court's remedy-which takes a hacksaw to Georgia's election code-is unconstitutional because it violates the doctrine of federalism and the Equal Protection Clause. A federal court faced with a facially unconstitutional state statute has but one remedy: strike down the statute in toto . Applied here, that remedy would be *1283 to enjoin enforcement of Georgia's entire mail-in voting scheme. The Court's remedy here is particularly abusive not only because it modifies the scheme, thus allowing it to stand, but because it allows the scheme to vary from county to county.
II.
As an initial matter, Plaintiffs have no viable facial challenge to the Statutes.
In Plaintiffs' view, the "opportunity to be heard is-or is not-provided by the statute on its face." Ga. Muslim Voter Project , slip op. at 21 (N.D. Ga. Oct. 24, 2018) (order granting temporary restraining order). As such, they must show that "no set of circumstances exists under which the law would be valid." J.R. v. Hansen , 803 F.3d 1315, 1320 (11th Cir. 2015) (alteration omitted) (quoting Horton v. City of St. Augustine , 272 F.3d 1318, 1329 (11th Cir. 2001) ); see also GeorgiaCarry.Org, Inc. v. Georgia , 687 F.3d 1244, 1261 (11th Cir. 2012) (requiring that, as to a facial challenge, a statute be "unconstitutional in all applications" (citing United States v. Salerno , 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) )). To succeed on their procedural due process challenge, Plaintiffs must identify a liberty interest that is burdened. Putting these two concepts together, then, Plaintiffs must show that the identifiable liberty interest is burdened in all of the law's applications.
For scores of Georgia's mail-in voters, however, the Statutes are valid. The District Court determined that Plaintiffs have a "right to apply for and vote via absentee ballot." Ga. Muslim Voter Project , slip op. at 22 (N.D. Ga. Oct. 24, 2018) (order granting temporary restraining order). But countless mail-in voters' signatures are determined by election officials to match. These voters successfully apply for mail-in ballots and, when they return those ballots, successfully have their votes counted. For these voters, then, the right to apply for and vote via mail-in ballot is not burdened at all. For this reason alone, Plaintiffs' facial challenge to the Statutes fails as a matter of law.
III.
Even construed as an as-applied challenge, Plaintiffs' procedural due process claim still fails.
The state may not "deprive any person of life, liberty, or property[ ] without due process of law." U.S. Const. amend. XIV, § 1. A violation of procedural due process requires "(1) a deprivation of a constitutionally[ ] protected liberty or property interest; (2) state action; and (3) constitutionally inadequate process." Hansen , 803 F.3d at 1320 (alteration omitted) (quoting Grayden v. Rhodes , 345 F.3d 1225, 1232 (11th Cir. 2003) ). My focus is on the third element alone-the process due.
The Supreme Court in Parratt v. Taylor told us what process is due in cases when, as here, we face the "impracticality of providing any meaningful predeprivation process," given a "random and unauthorized act by a state employee." Parratt , 451 U.S. at 539, 541, 101 S.Ct. at 1915, 1916. In such situations, "postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide."[25] Zinermon , 494 U.S. at 128, 110 S.Ct. at 985. The only relevant question once we determine *1284 that Parratt applies is whether the state's post-deprivation remedies are constitutionally adequate. Cf. McKinney , 20 F.3d at 1562 (observing that "procedural due process violations do not become complete 'unless and until the state refuses to provide due process' " (quoting Zinermon , 494 U.S. at 123, 110 S.Ct. at 983 )).
I explain below that this case is a textbook application of Parratt and that Georgia provides a constitutionally adequate remedy. I also explain that the remedy in state court more effectively and efficiently resolves Plaintiffs' grievance than does the District Court's solution.
A.
This case falls squarely within Parratt because it would be impracticable for Georgia to provide additional pre-deprivation procedures. Cf. Fetner v. City of Roanoke , 813 F.2d 1183, 1185-86 (11th Cir. 1987) ("The touchstone in Parratt was the impracticability of holding a hearing prior to the claimed deprivation." (citing Parratt , 451 U.S. at 539-41, 101 S.Ct. at 1914-16 )).
To state the obvious, the Statutes do not authorize election officials to deprive eligible voters of the right to apply for and to vote by mail-in ballot. Indeed, the very fact that the Secretary would remove election officials shown to perform erroneous signature reviews reveals that election officials "lack[ ] the state-clothed authority to deprive persons of constitutionally protected interests." See Burch v. Apalachee Cmty. Mental Health Servs., Inc. , 840 F.2d 797, 801 n.9 (11th Cir. 1988) (en banc) (emphasis omitted), aff'd sub nom. Zinermon v. Burch , 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) ; see also Dykes v. Hosemann , 776 F.2d 942, 952 (11th Cir. 1985) (Tjoflat, J., concurring in part and dissenting in part) (reasoning that state officials lack such authority when the state subjects them to consequences for wrongdoing).
I have no doubt, of course, that election officials make erroneous determinations. But the relevant question under Parratt is whether it is practicable for the state to do more. The volume of signatures at issue in this case provides a ready answer to that question. As of November 2, 2018, 184,925 mail-in ballots had been returned statewide.[26] And another 85,398 were still outstanding.[27] That's 270,323 ballots. Recall, too, that a mail-in ballot does not issue before an application, which also requires a signature review. Ga. Code Ann. § 21-2-381. In short, Georgia's election officials were in for 540,646 signature reviews this past election cycle. It is simply not practicable to provide pre-deprivation notice and an opportunity to be heard when so many signature reviews are at issue.
B.
Plaintiffs have a remedy; it just isn't a federal one.
Georgia superior courts, the state's courts of general jurisdiction, provide Plaintiffs a forum in which to sue the election officials. See Ga. Const. art. VI, § 4, ¶ 1 ("The superior courts shall have jurisdiction in all cases, except as otherwise provided in this Constitution."). Plaintiffs, moreover, have a procedural due process claim under the state constitution, which prohibits the deprivation of "life, liberty, or property except by due process of law," id. art. I, § 1, para. 1, and which confers a private right of action, see, e.g. , *1285 Atlanta Taxicab Co. Owners Ass'n v. City of Atlanta , 281 Ga. 342, 638 S.E.2d 307, 314 (2006). In short, I have no doubt that a suit in state court would make Plaintiffs whole-in other words, that they would be able to vote by mail-in ballot.[28]
When, as here, it is impracticable for a state like Georgia to provide predeprivation process for erroneous signature reviews because the state must conduct over half a million reviews in short order, a post-deprivation suit against election officials in state court is a constitutionally sufficient remedy.
C.
What the majority fails to realize is not just that a remedy in Georgia superior court is sufficient but that it is also superior.
The District Court orders election officials to craft ad hoc administrative tribunals and vests Georgia's superior courts with jurisdiction to review the tribunals' decisions. The Court's remedy requires Plaintiffs to leap through four hoops.
• A voter must wait to see whether he or she receives rejection notice.
• The voter must then respond to the notice. (The TRO does not tell us the means of responding or the timeframe for doing so.)
• If the voter challenges the election official's signature determination, he or she attends a hearing held by an unknown adjudicator. (The TRO does not tell us who.)
• If the adjudicator upholds the official's signature determination, the voter can appeal the decision to the superior court.
That's a fatiguing process, which is made all the more frustrating by the fact that Plaintiffs might still end up in superior court. I would send Plaintiffs directly to superior court-the neutral decisionmaker that wields the constitutional power to remedy their deprivations in the first instance.
IV.
Set all of this aside, now, and assume that Georgia's mail-in voting scheme does violate procedural due process and thus that the District Court was right to award some remedy. The Court still violated two bedrock constitutional principles when it crafted its injunction. First, in re-writing Georgia's election code, the Court violated the doctrine of federalism, which prevents federal courts from taking action that, if done by a state's own courts, would breach separation of powers. And second, it violated equal protection because in re-writing Georgia's election code, it created a system whereby the same mail-in application or ballot might be counted in one Georgia county but not in another. The Supreme Court's decision in Bush v. Gore , 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (per curiam), forecloses any remedy that, like the District Court's sweeping injunction, lacks "specific standards to ensure its equal application." Id. at 106, 121 S.Ct. at 530. I explain each of the District Court's errors in turn.
A.
The District Court wrongfully took its finding of a procedural due process violation *1286 as an invitation to rewrite Georgia's election code out of whole cloth. I illustrate how the Court inserted a new provision into the Code and then detail why, under the doctrine of federalism, that insertion amounts to a constitutional violation.
1.
The District Court's injunction creates a new statutory provision in Georgia's election code. In relevant part, it requires county officials to provide pre-rejection notice, to set up ad hoc administrative tribunals to adjudicate signature disputes, and to allow an attorney to stand in for voters at those proceedings. It also vests Georgia's superior courts with appellate jurisdiction over the tribunals:
The county elections official shall ... provide pre-rejection notice and an opportunity to resolve the alleged signature discrepancy to the absentee voter. This process shall be done in good faith and is limited to confirming the identity of the absentee voter consistent with existing voter identification laws. The elections official is required to send rejection notice via first-class mail and also electronic means, as available or as otherwise required by law. This process shall include allowing the absentee voter to send or rely upon a duly authorized attorney or attorney in fact to present proper identification. ... The absentee voter shall have the right to appeal any absentee ballot rejection following the outcome of the aforementioned process, as designated in [Ga. Code Ann.] § 21-2-229(e).[29]
Ga. Muslim Voter Project , slip op. at 2 (N.D. Ga. Oct. 25, 2018) (temporary restraining order) (citations omitted). For mail-in ballot applications with signatures that are determined not to match, the injunction requires election officials to provide voters with provisional ballots:
[F]or all ballot applications where a signature mismatch is perceived, the county elections official shall ... provide a provisional absentee ballot to the absentee voter along with information as to the process that will be followed in reviewing the provisional ballot. ... Once any provisional ballot is received, the procedure outlined in section 1 above is to be followed.
Id. at 3.
The egregiousness of the District Court's overreaching is apparent once the injunction is examined alongside Georgia's election code. The code prescribes three ways in which a voter's qualifications or right to vote can be challenged. See Ga. Code Ann. §§ 21-2-228 (challenges to voter qualifications by boards of registrars), -229 (challenges to voter qualifications by other voters), -230 (challenges to the right to vote by other voters).[30] For those mechanisms, Georgia's legislature outlined intricate procedures for administrative adjudication followed by judicial review in the superior courts. These procedures, each of which I set out fully in an appendix, see Appendix B, outline every possible detail of the adjudicatory process, including filing *1287 of a complaint, service of process, standards for allowing a complaint to go forward, burdens of proof, allowances for discovery (including subpoenas), allocations of costs, and timeframes and procedures for appeal.
Sections 21-2-228, - 229, and - 230 collectively reveal two important facts: first, the District Court contravened Georgia's legislature's will when it wrote into the election code its own provision and relatedly, the legislature deliberately omitted the Court's provision because it would be impossible to implement.
First, the level of detail that §§ 21-2-228, - 229, and - 230 provide prevent the District Court from hiding behind any assertion that it was merely effectuating the legislature's intent; the legislature knew how to write the Court's remedial scheme for itself had it wanted to. Cf. Expressio Unius Est Exclusio Alterius , Black's Law Dictionary (10th ed. 2014) ("[T]o express or include one thing implies the exclusion of the other ...."). Said differently, the purposeful inclusion of the procedures in §§ 21-2-228, - 229, and - 230 evidences the legislature's purposeful exclusion of them from the Statutes-sections within the same code title .[31]
Second, the District Court's remedy is unachievable, something that Georgia's legislature was well aware of when it declined to write the Court's remedial scheme into the Statutes. The challenges created by §§ 21-2-228 and - 229 can be conducted at any time because they concern counties' and municipalities' lists of voters, lists that are perpetually in existence. Indeed, § 21-2-228 charges counties and municipalities with examining voters' qualifications "from time to time." Ga. Code Ann. § 21-2-228(a). When examinations can occur throughout the year, administrative adjudications and judicial review are feasible.[32] Here, by contrast, all signature examinations would be forced to occur in a span of less than two months.[33]
2.
The Georgia Supreme Court-or for that matter, any Georgia court-could not rewrite the Statutes as the District Court has done here. The Georgia Constitution requires strict separation of powers. See Ga. Const. art. I, § 2, para. 3 ("The legislative, judicial, and executive powers shall forever remain separate and distinct; and no person discharging the duties of one shall at the same time exercise the functions of either of the others except as herein provided."). That paragraph, at bare minimum, precludes judicial rewriting of statutes. See *1288 Robinson v. Boyd , 288 Ga. 53, 701 S.E.2d 165, 168 (2010) ("Under our system of separation of powers this Court does not have the authority to rewrite statutes." (alteration omitted) (quoting State v. Fielden , 280 Ga. 444, 629 S.E.2d 252 (2006) )); see also Lumpkin Cty. v. Ga. Insurers Insolvency Pool , 292 Ga. 76, 734 S.E.2d 880, 882 (2012) ("[A] court of law is not authorized to rewrite the statute by inserting additional language" (quoting Abdulkadir v. State , 279 Ga. 122, 610 S.E.2d 50, 53 (2005) )).
Our Constitution, which enshrines federalism, requires us, as a federal court, to respect Georgia's choice on its own governmental structure.[34] As a sister circuit has said, "Even the narrowest notion of federalism requires us to recognize a state's interest in preserving the separation of powers within its own government as a compelling interest." White , 416 F.3d at 773. The court explained that a "state's choice of how to organize its government is 'a decision of the most fundamental sort for a sovereign entity.' " Id. (quoting Gregory v. Ashcroft , 501 U.S. 452, 460, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991) ).
So what was the District Court to do if it found, contrary to my conclusion, that Georgia's mail-in voting scheme violated procedural due process?
The power that the Supremacy Clause, see U.S. Const. art. VI, para. 2, grants federal courts that undertake judicial review of state statutes is limited to refusing to apply state rules of decision that they believe are unconstitutional. See United States v. Frandsen , 212 F.3d 1231, 1235 (11th Cir. 2000) ("The remedy if the facial challenge is successful is the striking down of the regulation ...." (citing Stromberg v. California , 283 U.S. 359, 369-70, 51 S.Ct. 532, 536, 75 L.Ed. 1117 (1931) )); see also Henry M. Hart, Jr. & Albert M. Sacks, The Legal Process 154 (1994) ("American courts have no general power of control over legislatures. Their power, tout simple , is to treat as null an otherwise relevant statute which they believe to be beyond the powers of the legislature ...."). That power does not extend-as the District Court clearly believed-to prescribing new rules of decision on the state's behalf. See Virginia v. Am. Booksellers Ass'n , 484 U.S. 383, 397, 108 S.Ct. 636, 645, 98 L.Ed.2d 782 (1988) ("[W]e will not rewrite a state law to conform it to constitutional requirements.").[35]
*1289 The District Court could impose no remedy other than full-on injunction of Georgia's mail-in voting scheme in all of its applications. The Court, in other words, can offer Georgia a choice: forego mail-in voting altogether-a privilege that the Constitution does not require states to confer-or rework the mail-in voting scheme so that it accords with procedural due process. As a separate sovereign, Georgia is entitled to make that choice without the District Court's interference. Cf. Stanton v. Stanton , 421 U.S. 7, 18, 95 S.Ct. 1373, 1379, 43 L.Ed.2d 688 (1975) (holding that the means of remedying a constitutionally defective statute "plainly is an issue of state law to be resolved by the [state] courts on remand"); see also Eric S. Fish, Choosing Constitutional Remedies , 63 UCLA L. Rev. 322, 350 (2016) ("In most cases, courts do not permit themselves to add language. They cannot, for instance, add new procedures to a statute to satisfy due process requirements ....").
Here's the long and short of it: the District Court violated the Constitution's command to respect Georgia's decision to separate its governmental functions. Because Georgia has precluded its state's courts from rewriting its legislative enactments, our Constitution prevents the District Court from doing the same.[36]
B.
The District Court not only rewrote Georgia's election code, but it did so in a completely standardless manner-in plain violation of what the Equal Protection Clause requires.
The District Court requires election officials to "provide pre-rejection notice and an opportunity to resolve the alleged signature discrepancy to the absentee voter." Ga. Muslim Voter Project , slip op. at 2 (N.D. Ga. Oct. 25, 2018) (temporary restraining order). It then leaves election officials to fill in the details of that process, requiring only that they do so "in good faith." Id. Though "good faith" may be sufficient for an agreement between two *1290 friends, it is constitutionally defective guidance to protect the fundamental right to vote.
As the Supreme Court explained in Bush v. Gore , "When a court orders a statewide remedy, there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied." 531 U.S. at 109, 121 S.Ct. at 532. There, various of Florida's 67 counties employed a system whereby voters selected a candidate by punching through the ballot, thus creating a hole next to the candidate's name. Id. at 105, 121 S.Ct. at 530. But many voters failed to fully punch the ballot, so the ballots contained partial perforations or, in some cases, only indentations. Id. The Florida Supreme Court ordered each of Florida's counties to divine the "intent of the voter." Id. The Court explained that the Florida Supreme Court's command was "unobjectionable as an abstract proposition and a starting principle." Id. at 106, 121 S.Ct. at 530. The problem, however, "inhere[d] in the absence of specific standards to ensure its equal application." Id. The Court discussed, for example, how the voter's intent varies based on whether, for a ballot to be legally counted, a chad must be completely punched, whether it must only be dimpled, or whether it must only be punched enough so that "any light could be seen." Id. at 106-07, 121 S.Ct. at 531.
The District Court's injunction is similarly standardless because it leaves numerous questions unanswered:
• Does the administrative tribunal owe any deference to the election official's decision? If so, under what standard is the decision reviewed?
• Is evidence admissible? If so, what evidence?
• How is that evidence obtained, i.e., what discovery is available?
• Who bears the burden of proof? What burden does that party face?
Because each county can answer these questions differently, Equal Protection rears its head. The irony, of course, is that Georgia's legislature avoided these Bush v. Gore problems when it crafted §§ 21-2-228, - 229, and - 230, each of which answers the questions that the Court here left for "good faith" implementation.
In short, the District Court could not, in crafting a remedy, create a system of utterly standardless review. When the processes for determining whether two signatures match vary from county to county, the court has provided inadequate protection for the fundamental right to vote.
* * *
For these reasons, I respectfully dissent.
Appendix A: District Court's Preliminary Injunction
IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION
RHONDA J. MARTIN, et al. , Plaintiffs,
v.
BRIAN KEMP, et al. , Defendants.
CIVIL ACTION NO. 1:18-CV-4776-LMM
GEORGIA MUSLIM VOTER PROJECT, et al. , Plaintiffs,
v.
BRIAN KEMP, et al. , Defendants.
CIVIL ACTION NO. 1:18-CV-4789-LMM
TEMPORARY RESTRAINING ORDER
Based upon the Court's prior findings, see Martin Dkt. No. [23]; GMVP Dkt. No.
*1291 [28], the Secretary of State's Office shall issue the following instructions to all county boards of registrars, boards of elections, election superintendents, and absentee clerks:
1) All county elections officials responsible for processing absentee ballots shall not reject any absentee ballots due to an alleged signature mismatch. Instead, for all ballots where a signature mismatch is perceived, the county elections official shall treat this absentee ballot as a provisional ballot, which shall be held separate and apart from the other absentee ballots. See O.C.G.A. § 21-2-419 ; Ga. Comp. R. & Regs. 183-1-14-.03(2). The county elections official shall then provide pre-rejection notice and an opportunity to resolve the alleged signature discrepancy to the absentee voter. This process shall be done in good faith and is limited to confirming the identity of the absentee voter consistent with existing voter identification laws. See O.C.G.A. §§ 21-2-417, -417.1. The elections official is required to send rejection notice via first-class mail and also electronic means, as available or as otherwise required by law. See O.C.G.A. § 21-2-384(a)(2). This process shall include allowing the absentee voter to send or rely upon a duly authorized attorney or attorney in fact to present proper identification. This process shall be done prior to the certification of the consolidated returns of the election by the election superintendent. See O.C.G.A. § 21-2-230(g). The absentee voter shall have the right to appeal any absentee ballot rejection following the outcome of the aforementioned process, as designated in O.C.G.A. § 21-2-229(e). Any aforementioned appeals that are not resolved as of 5 p.m. on the day of the certification deadline shall not delay certification and shall not require recertification of the election results unless those votes would change the outcome of the election. See O.C.G.A. § 21-2-493(l).
2) All county elections officials responsible for processing absentee ballot applications shall not reject any absentee ballot application due to an alleged signature mismatch. Instead, for all ballot applications where a signature mismatch is perceived, the county elections official shall, in addition to the procedure specified in O.C.G.A. § 21-2-381(b), provide a provisional absentee ballot to the absentee voter along with information as to the process that will be followed in reviewing the provisional ballot. The outer envelope of the absentee ballot provided shall be marked provisional. Once any provisional ballot is received, the procedure outlined in section 1 above is to be followed.
3) This injunction applies to all absentee ballot applications and absentee ballots rejected solely on the basis of signature mismatches submitted in this current election. This injunction does not apply to voters who have already cast an in-person vote.
IT IS SO ORDERED this 25th day of October, 2018.
/s/ Leigh Martin May
Leigh Martin May
United States District Judge
Appendix B: Compiled Sections of Georgia's Election Code
Section 21-2-228
Section 21-2-228 requires the state's counties and municipalities to periodically examine their electors' qualifications. The board of registrars, upon questioning the right of any existing elector to remain on the list of electors, "shall give such person *1292 at least three days' written notice of the date, time, and place of a hearing." Id. § 21-2-228(d). The board must send notice by first-class mail or by personal service by various law-enforcement officers. Id. If a majority of the registrars determines that the elector lacks the necessary qualifications, the elector is removed from the list of electors and must be sent notice in the same manner described above. Id. §§ 21-2-228(e), - 228(b). An aggrieved elector "shall have a right of appeal." Id. § 21-2-228(f). The elector exercises that right by "filing a petition with the clerk of the superior court within ten days after the date of the decision of the registrars." Id. The board must receive a copy of the petition. Id. The board's decision "shall stand" unless it is reversed by the court. Id.
The board has broad investigatory powers. It may "require the production of books, papers, and other material" and "subpoena witnesses," whom it may swear. Id. § 21-2-228(b). All with at least three days' notice. Id. As to the witnesses, all summonses, notices, and subpoenas issued by the board are required to be served by designated law-enforcement officers, who receive specified compensation for these services. Id. § 21-2-228(c). The witnesses themselves "shall be allowed and paid the same mileage and fee as allowed and paid witnesses in civil actions in the superior court." Id. The failure of a subpoenaed witness to attend or testify "shall be reported immediately by the registrars to the appropriate superior court." Id. The court "shall order such witness to attend and testify," and the witness, upon refusal, "shall be dealt with as for contempt." Id.
Section 21-2-229
Section 21-2-229 allows one elector to challenge the qualifications of a person "applying to register to vote" or "whose name appears on the list of electors," so long as the person is in the same county or municipality. Id. § 21-2-229(a). The challenge "shall be in writing and shall specify distinctly the grounds." Id. Upon receiving a challenge, the board of registrars "shall set a hearing," notice of the date, time, and place of which "shall be served" upon the challenger and the challenged party. Id. § 21-2-229(b). The challenged party "shall receive at least three days' notice" in the manner provided for by § 21-2-228. Id. At the hearing, the burden of proof "shall be on the elector making the challenge." Id. § 21-2-229(c). After reaching a decision, the registrars "shall notify the parties of their decision." Id. § 21-2-229(d). If the challenge is successful, the "application for registration shall be rejected or the person's name removed from the list of electors." Id. The aggrieved elector "shall be notified" in the manner provided for by § 21-2-228. Id. Both the challenger and the challenged elector "shall have a right of appeal," and the notice requirements for and consequences of appeal match those provided for by § 21-2-228. Id. § 21-2-229(e).
Here too, the code confers broad discovery powers. Upon petition by the challenger or the challenged elector, the board "shall have the authority to issue subpoenas for the attendance of witnesses and the production of books, papers, and other material." Id. § 21-2-229(c). The requesting party "shall be responsible to serve such subpoenas and, if necessary, to enforce the subpoenas by application to the superior court." Id. As is the case under § 21-2-228, the witnesses are compensated. Id.
*1293 Section 21-2-230
Section 21-2-230 allows one elector to challenge the right of any elector to vote, again so long as the person is in the same county or municipality. Id. § 21-2-230(a). The challenge "shall be in writing and specify distinctly the grounds." Id. If the challenge is made to a mail-in absentee ballot, it must be lodged before 5:00 p.m. on the day before the election; if it is made to an in-person absentee ballot, or if it is made to any other method of voting, it must be made before the vote is cast. Id.
The board "shall immediately consider such challenge and determine whether probable cause exists." Id. § 21-2-230(b). If the board finds probable cause, it "shall notify the poll officers" of the challenged elector's precinct or absentee ballot precinct and "if practical, notify the challenged elector and afford such elector an opportunity to answer." Id.
What happens thereafter depends on whether the challenged elector casts a ballot and on the grounds for the challenge.
• If the challenged elector seeks to cast a vote at the polls, and if it is practical to conduct a hearing before the close of polls, the board "shall conduct such hearing and determine the merits of the challenge." Id. § 21-2-230(h). If the board sustains the challenge, the elector "shall not be permitted to vote," and if the grounds for the challenge are ineligibility to remain on the list of electors, the elector's name "shall be removed from the list." Id. If the board denies the challenge, the elector "shall be permitted to vote." Id. Even if the polls have closed, the elector may still vote so long as he or she "proceeds to vote immediately after the decision of the registrars."Id.
• If the challenged elector seeks to cast a vote at the polls, but if it is impracticable to conduct a hearing before the close of polls or if the board at any time determines that it could not render a decision within a "reasonable time," the elector "shall be permitted to vote by casting a challenged ballot on the same type of ballot that is used ... for provisional ballots." Id. § 21-2-230(i). Here too, the elector may still vote even if the polls have closed, so long as he or she "proceeds to vote immediately after such determination of the registrars." Id. If the challenge is based on the eligibility of the elector to remain on the list of electors, the board "shall proceed to finish the hearing prior to the certification of the consolidated returns of the election by the election superintendent." Id. If the challenge is based on other grounds, the board does not need to take further action. Id. Both the challenger and the challenged elector may appeal the board's decision in the same manner as is set out in § 21-2-229(e). Id.
• If the challenged elector casts an absentee ballot, and if the challenge concerns the elector's eligibility to remain on the list of electors, the board "shall proceed to conduct a hearing on the challenge on an expedited basis prior to the certification of the consolidated returns of the election." Id. § 21-2-230(g). The election superintendent "shall not certify such consolidated returns until such hearing is complete and the registrars have rendered their decision on *1294 the challenge." Id. If the board sustains the challenge, the challenged elector "shall be removed from the list of electors," and the ballot "shall be rejected and not counted." Id. Both the challenger and the challenged elector may appeal the board's decision in the same manner as is set out in § 21-2-229(e). Id.
• If the challenged elector casts an absentee ballot, but if it is impracticable to hold a hearing prior the close of polls, and if the challenge is not based on the elector's qualifications to remain on the list of electors, the ballot "shall be treated as a challenged ballot" as provided for by § 21-2-386(e). Id. § 21-2-230(e).
• If the challenged elector does not vote, absentee or otherwise, and if the challenge is based on the elector's qualifications to remain on the list of electors, the board "shall proceed to hear the challenge" pursuant to the procedures of § 21-2-229. Id. § 21-2-230(f).
• If the challenged elector does not vote, absentee or otherwise, and if the challenge is not based on the elector's qualifications to remain on the list of electors, the board does not need to take further action. Id. § 21-2-230(d).

Georgia's election code collectively refers to all voting that occurs before Election Day, whether in person or by mail, as "absentee voting."

A voter who votes in person, whether on Election Day or before Election Day, is verified by identification, not by signature. Ga. Code. Ann. § 21-2-417.

A bit more about Plaintiffs:
Ms. Jones suffers from "circulation problems that make it very difficult for her to stand in long lines or walk and to vote in-person." She submitted a mail-in ballot application in September 2018 that was rejected due to a signature mismatch. She then submitted additional forms, but as of one week before Election Day, she had yet to receive an absentee ballot.
The advocacy groups are the Georgia Muslim Voter Project and Asian-Americans Advancing Justice-Atlanta.

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) to hear the motions. Under an exception to the final-judgment rule, we have authority to review a district court's grant of injunctions. 28 U.S.C. § 1291(a)(1). Though the District Court entered a temporary restraining order ("TRO") under Federal Rule of Civil Procedure 65(b), not a preliminary injunction under Rule 65(a), the "label placed upon the order is not necessarily dispositive of its appealability." AT&T Broadband v. Tech Commc'ns, Inc. , 381 F.3d 1309, 1314 (11th Cir. 2004) (citation omitted). We treat a TRO as an injunction when "(1) the duration of the relief sought or granted exceeds that allowed by a TRO (ten days), (2) the notice and hearing sought or afforded suggest that the relief sought was a preliminary injunction, and (3) the requested relief seeks to change the status quo." Id. (citations omitted).
The TRO here is properly classified as a preliminary injunction because the TRO has no expiration, because the parties filed motions and the District Court held an evidentiary hearing, and because the relief requires the Secretary to take new action.

In deciding whether the Court should grant a stay pending appeal, the factors are
(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.
Nken , 556 U.S. at 434, 129 S.Ct. at 1761 (quoting Hilton v. Braunskill , 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987) ).

The cases are Parratt v. Taylor , 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), overruled on other grounds by Daniels v. Williams , 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), and McKinney v. Pate , 20 F.3d 1550 (1994) (en banc).

The Court explained that "Parratt is not an exception to the Mathews balancing test, but rather an application of that test to the unusual case in which one of the variables in the Mathews equation-the value of predeprivation safeguards-is negligible in preventing the kind of deprivation at issue."Zinermon v. Burch , 494 U.S. 113, 129, 110 S.Ct. 975, 985, 108 L.Ed.2d 100 (1990).

Ga. Sec'y of State, Election Update 1 (Nov. 2, 2018), http://sos.ga.gov/admin/uploads/ABSENTEE_TURNOUT_REPORT_11-2-181.pdf.

Ga. Sec'y of State, supra note 26, at 1.

To entertain Plaintiffs' procedural due process claim, the District Court must have believed that a Georgia court, hearing Plaintiffs' claim that they were unlawfully denied the right to vote, would do nothing to redress Plaintiffs' harm. Cf. McKinney , 20 F.3d at 1563 ("[U]nder Parratt , only the state's refusal to provide a means to correct any error ... would engender a procedural due process violation."). I find that belief to be utterly implausible.

The injunction presupposes a system of administrative tribunals because without an administrative hearing and a record thereof, the superior courts would be reviewing an administrative decision without any record before it.

The difference between § 21-2-229 and § 21-2-230 seems to be that a voter can be validly registered to vote yet not have the right to vote. For example, a person that meets all qualifications but for age may register to vote if that person would reach the legal age within six months of registration. Ga. Code Ann. § 21-2-216(c). That said, the person cannot actually vote until he or she reaches the legal age. Id.

In evaluating the legislature's intent, we look to the election code as a whole. See Black Warrior Riverkeeper, Inc. v. Black Warrior Minerals, Inc. , 734 F.3d 1297, 1302 (11th Cir. 2013) ("[T]he 'fundamental canon of statutory construction is that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme' and that a court should 'fit, if possible, all parts into a harmonious whole.' " (alterations omitted) (citing FDA v. Brown & Williamson Tobacco Corp. , 529 U.S. 120, 132-33, 120 S.Ct. 1291, 1301, 146 L.Ed.2d 121 (2000) )).

Examinations under § 21-2-229, which authorizes one elector to challenge another elector's qualifications, can also occur throughout the year. Though examinations under § 21-2-230, which authorizes one elector to challenger another elector's right to vote, occur once voting has begun, the volume of challenges under that section pales in comparison to the volume of signature reviews at issue here.

The boards of registrars cannot issue mail-in ballots more than 49 days before a general election, Ga. Code Ann. § 21-2-384(a)(2), and the superintendents of elections must transmit consolidated returns to the secretary of state no later than 5:00 P.M. on the Monday following the election, id. § 21-2-493(k).

The reason is simple: separation of powers within a state implements federalism's purpose in our constitutional structure. Whereas federal separation of powers secures liberty by diffusing power among coequal branches of the same sovereign, federalism further secures liberty by diffusing power among different sovereigns. See, e.g. , Bond v. United States , 564 U.S. 211, 222, 131 S.Ct. 2355, 2364, 180 L.Ed.2d 269 (2011) ("By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power."); see also Metro. Wash. Airports Auth. v. Citizens for Abatement ofAircraft Noise, Inc. , 501 U.S. 252, 285, 111 S.Ct. 2298, 2316, 115 L.Ed.2d 236 (1991) (noting that federalism "protects the rights of the people no less than separation-of-powers principles" (citing The Federalist No. 51, at 323 (James Madison) (Clinton Rossiter ed., 1961))). If states in turn choose to embrace separation of powers, liberty is only further protected. Cf. Republican Party of Minn. v. White , 416 F.3d 738, 773 (8th Cir. 2005) ("Separation of powers is a concept basic to the states' constitutions as well as the federal Constitution.").

Remarkably, courts cannot rewrite statutes even by striking down language, rather than by adding it. Take severability clauses-which this statute noticeably lacks. In Whole Woman's Health v. Hellerstedt , --- U.S. ----, 136 S.Ct. 2292, 195 L.Ed.2d 665 (2016), as revised (June 27, 2016), for example, the state defendant argued for a "narrowly tailored judicial remedy," not facial invalidation, by pointing to a severability clause in Texas' abortion statute. Id. at 2318-19. But the Supreme Court responded that a "severability clause is not grounds for a court to 'devise a judicial remedy that entails quintessentially legislative work.' " Id. at 2319 (alterations omitted) (quoting Ayotte v. Planned Parenthood of N. New Eng. , 546 U.S. 320, 329, 126 S.Ct. 961, 968, 163 L.Ed.2d 812 (2006) ).

Ironically, the District Court could not do to a statute passed by Congress what it today does to one passed by Georgia's legislature. See Harris v. Garner , 216 F.3d 970, 976 (11th Cir. 2000) ("[T]he role of the judicial branch is to apply statutory language, not to rewrite it." (citing Badaracco v. Comm'r , 464 U.S. 386, 398, 104 S.Ct. 756, 764, 78 L.Ed.2d 549 (1984) ("Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement."); then citing Blount v. Rizzi , 400 U.S. 410, 419, 91 S.Ct. 423, 429, 27 L.Ed.2d 498 (1971) ("[I]t is for Congress, not this Court, to rewrite the statute."); then citing Korman v. HBC Florida, Inc. , 182 F.3d 1291, 1296 (11th Cir. 1999) ("It is not the business of courts to rewrite statutes."))); Califano v. Westcott , 443 U.S. 76, 95, 99 S.Ct. 2655, 2666, 61 L.Ed.2d 382 (1979) (Powell, J., concurring in part and dissenting in part) (reasoning that when a statute is held unconstitutional, "it is the duty and function of the Legislative Branch to review its [statute] in light of [the court's] decision and make such changes therein as it deems appropriate"); see also Fish, supra , at 339 ("[I]f judges could add language to statutes in ordinary cases, then the judiciary would effectively become a second legislature.").
The District Court's behavior here is in fact worse. Whereas rewriting congressional statutes implicates only the separation of powers between Congress and the Judiciary-two coequal branches within the same sovereign-rewriting state statutes intrudes on the authority of a distinct sovereign. See Welsh v. United States , 398 U.S. 333, 367 n.15, 90 S.Ct. 1792, 1811 n.15, 26 L.Ed.2d 308 (1970) (Harlan, J., concurring in the result) (noting the "limited discretion [the] Court enjoys to extend a policy for the State even as a constitutional remedy" (citations omitted)).